**REVISED**

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

———————————

No. 95-50811

———————————

ROSA H., Individually and
as next friend of Deborah H.,

Plaintiff-Appellee,

versus

SAN ELIZARIO INDEPENDENT
SCHOOL DISTRICT, ET AL,

Defendants,

SAN ELIZARIO INDEPENDENT
SCHOOL DISTRICT,

Defendant-Appellant.

———————————

Appeal from the United States District Court
for the Western District of Texas

———————————

February 17, 1997

Before KING and HIGGINBOTHAM, Circuit Judges, and LAKE,[*] District
Judge.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

This case requires us to decide whether Title IX, 20 U.S.C. §§ 1681-1688, creates liability on the part of a public school district that negligently fails to prevent an instructor from sexually abusing a student. We hold that it does not. In order to hold a school district liable under Title IX for teacher-student

———————————

[*]District Judge of the Southern District of Texas, sitting by designation.

sexual harassment based on a hostile educational environment, a plaintiff must show that an employee who has been invested by the school board with supervisory power over the offending employee actually knew of the abuse, had the power to end the abuse, and failed to do so. We reverse the plaintiff's jury verdict and remand for further proceedings.

I.

A.

In the fall of 1992, Deborah H. entered San Elizario High School, where she had a sustained sexual relationship with John Contreras, the school's karate instructor. The relationship ultimately caused Deborah to become suicidal, to be committed to a psychological hospital, and to leave San Elizario before the end of the academic year. Although Contreras denies all allegations of sexual contact with Deborah, the jury understandably concluded in a special interrogatory that Contreras sexually abused Deborah. A reasonable juror could have concluded the following.

The school district employed Contreras from the fall of 1992 until the spring of 1994, when it fired him for reasons unrelated to the facts of this case. His only responsibility was to offer weekly martial arts classes on school grounds at the close of the school day. These classes were meant to provide students with productive after-school activities, and school personnel supervised and attended each karate class. There was no evidence that the twenty-nine-year-old Contreras had a history of sexual offenses or was a danger to children.

2

Deborah enrolled in the karate class largely because her two sisters had enrolled. After several weeks, Contreras took a special interest in Deborah, who had recently turned fifteen. He often drove her home after class. He complimented her appearance, including not only her hair, but also her breasts. Other students noticed that Contreras was attracted to Deborah, and Brenda Soto, a social worker employed by the school district, may have seen Contreras kiss Deborah on school grounds. But most of the physical contact occurred in Contreras's car or at his home. Within weeks of Deborah's enrollment in the karate class, Contreras initiated sexual intercourse. Contreras had sex with Deborah at his house on a regular basis in December, January, and February, often during the school day. When Deborah insisted that she would get in trouble for missing school, Contreras assured her that the school did not require her to attend so long as she was with him.

Deborah's parents knew nothing about her relationship with Contreras. Deborah's father approved of the karate lessons and even paid Contreras to give all four of his children private karate lessons at their home. On occasion, Contreras brought martial arts films to show at Deborah's home and stayed to eat dinner with her family. As far as Deborah's mother, Rosa H., was concerned, Contreras was a pleasant young teacher who could provide a positive role model for Deborah and her other children.

The record is less clear on the question of whether school officials knew about Contreras's sexual relations with Deborah. Deborah testified that in February she visited Julian Encina, the

high school counselor, and confided that she had been having sex with Contreras. Encina admitted before the jury that he had counseled Deborah roughly once a week, but he denied that Deborah told him anything confidentially about her relations with Contreras. Soto testified that Encina informed her in February that Deborah and Contreras might be having some sort of relationship. She passed this information on to Frank Duran, the director of San Elizario's special programs.

On the morning of February 22, 1993, Rosa discovered Deborah at Contreras's house during school hours. She became suspicious of Contreras's relationship with her daughter. Later that morning, she and Deborah met with Encina and Robert Longoria, the high school principal. Deborah became upset during the meeting, and when Contreras's name came up she blurted out: "Well, what do you want me to tell you, mom? Do you want me to tell you that I'm fucking him? Well, I'm not going to tell you that because it's not true." Longoria, who was unaware of the karate program and had not met Contreras, testified that he regarded the outburst as part of a typical family quarrel rather than as an indication that Contreras was sexually abusing Deborah.

Toward the end of March, Rosa listened in on a telephone conversation between Contreras and Deborah that included explicit sexual language and confirmed Rosa's suspicion that Contreras was having sex with her daughter. Rosa refused to allow Deborah to see Contreras without a chaperon. Deborah became increasingly distraught, and on March 29 she locked herself in her bedroom with

4

her father's loaded guns and threatened to kill herself. After an April 5 commitment hearing, Deborah was placed in the custody of mental health professionals for approximately two months. In order to avoid Contreras, she enrolled in a private boarding school in the fall of 1993.

School officials attended the April 5 hearing and heard Deborah describe her relationship with Contreras. The school superintendent, Beatriz Curry, called a meeting the next day to discuss how the school should respond to Deborah's situation. Principal Longoria, Frank Duran, Julian Encina, Brenda Soto, and another school social worker, Linda Apodaca, attended the meeting. After an initial decision to suspend the karate program, Superintendent Curry decided on the advice of counsel to continue to have Contreras offer the classes under close monitoring. Curry asked her staff to write down whatever they knew about Deborah's relationship with Contreras and to collect information to determine whether the school should make a report to law enforcement authorities. But the school did not mount a full-scale investigation into whether Contreras posed a risk of sexual abuse or notify Fran Hatch, the school's Title IX coordinator, that Contreras had sexually abused Deborah. Nor did school officials report Contreras to law enforcement authorities. He worked at San Elizario High School for another year under heightened supervision and without committing further sexual harassment. In the spring of 1994, the school district fired him because he failed repeatedly to

supply the district's personnel office with an adequate photo identification.

B.

On behalf of her daughter, Rosa sued both the San Elizario Independent School District and Contreras. The complaint asserted that both defendants violated both Title IX and 42 U.S.C. § 1983. The defendants have already prevailed on most of these claims. Contreras himself is no longer a party: the trial court dismissed the Title IX count as to Contreras, and Rosa dismissed the § 1983 count against Contreras at the close of evidence. The court also entered summary judgment in favor of the school district under § 1983. Rosa has not appealed these dispositions, and we are left only with Title IX as a possible basis for the school district's liability.

At the close of the plaintiff's case, the school district moved for judgment as a matter of law on the grounds that an educational institution cannot be liable under Title IX unless it discriminates intentionally. The court denied this motion and explained in a written memorandum that under principles of agency law, the school district could be vicariously liable for the intentional torts of its employees if the district acted negligently. According to the district court, the requirement that an educational institution discriminate intentionally before being subject to Title IX liability does not foreclose the application of the doctrine of respondeat superior.

The court instructed the jury that

> Title IX places on San Elizario Independent School District a duty not to act negligently toward its students. If you find from a preponderance of the evidence that San Elizario Independent School District acted negligently in failing to take prompt, effective, remedial action with respect to what it knew or should have known, then it violated Title IX.

After four days of testimony, the jury awarded the plaintiff $100,000 in past compensatory damages and $200,000 in future compensatory damages. It found specifically that Contreras sexually harassed or abused Deborah, that the school district had notice of Contreras's conduct,[1] that the district failed to take prompt effective remedial action, and that the district's failure to act was negligent.

## II.

Under Title IX, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). We recently rejected the notion that this language creates strict liability on the part of school districts whose teachers sexually abuse students. <u>Canutillo Indep. School Dist. v. Leija</u>, 101 F.3d 393, 398-400 (5th Cir. 1996). But the facts in <u>Leija</u> did not require us to confront the question of what the liability standard in teacher-student sexual abuse cases

---

[1]The school district asked the court to instruct the jury that "the San Elizario Independent School District Board is the policymaking official whose actions may be attributable to the School District." But the jury charge did not specify what actors count as the "school district." As far as we can tell, the jury found merely that school employees had notice of the conduct.

7

actually is.  This case, by contrast, compels us to decide which of the three liability theories outlined in Leija — the agency theory, the Title VII theory, or the restrictive theory that requires actual, intentional discrimination — applies when a student suffers sexual abuse at the hands of a public school teacher.

The San Elizario Independent School District receives federal funds, and in light of the jury's findings and the relevant law, there is no question that Deborah was subjected to discrimination based on sex.  According to the school district, the trial court's mistake was that the jury charge allowed liability without a finding of intentional discrimination on the part of the school board;  negligence alone in failing to prevent a teacher from sexually harassing a student, the school district argues, is insufficient to establish that the discrimination took place "under any education program or activity."

It is not quite that simple.  The trial court recognized that there can be no liability for damages under Title IX without intentional discrimination.  887 F. Supp. at 142.  Its theory of liability hinged on imputation of intent.  That is, its jury instructions were based on the view that the principles of vicarious liability can create culpability on the part of the school district and thus satisfy Title IX's intent requirement. The trial court relied specifically on section 219(2)(b) of the Restatement (Second) of Agency, which states that "[a] master is not subject to liability for the torts of his servants outside the

8

scope of their employment, unless . . . the master was negligent or reckless."

We do not agree that a plaintiff can evade Title IX's intent requirement so easily. For the reasons we explain below, we hold that when a teacher sexually abuses a student, the student cannot recover from the school district under Title IX unless the school district actually knew that there was a substantial risk that sexual abuse would occur. In requiring actual knowledge, we reject the district court's theory that agency law can substitute imputed discriminatory intent for actual discriminatory intent in Title IX cases.

Minor students who have been subjected to a sexual relationship with their teachers have a private cause of action for monetary damages. In Franklin v. Gwinnett County Public Schools, 503 U.S. 60 (1992), a female high school student alleged that a teacher forced her to have intercourse with him, that the school administrators knew of this sexually abusive relationship, and that the school did nothing to stop the harassment. The Supreme Court held that the student's complaint should not have been dismissed because Title IX allows students to recover damages when an educational institution engages in intentional discrimination. But the Franklin Court did not decide whether the school district itself had intentionally discriminated. The Court cited Meritor Sav. Bank v. Vinson, 477 U.S. 57, 64 (1986), for the proposition that sex discrimination includes sexual harassment. It then explained that the rationale behind limiting remedies for

violations of statutes, such as Title IX, that are enacted under Congress's spending power does not apply when the violation is intentional.[2]

Some courts have read <u>Franklin</u> as endorsing some sort of agency theory in Title IX teacher-student sexual harassment cases. <u>See, e.g.</u>, <u>Bolon v. Rolla Public Schools</u>, 917 F. Supp. 1423, 1428 (E.D. Mo. 1996) ("[<u>Franklin</u>] indicates that the Supreme Court would impose liability against a school district . . . for the intentional discrimination by an agent, regardless of whether the district court 'knew or should have known' about the discrimination."); <u>Doe v. Petaluma City School Dist.</u>, 830 F. Supp. 1560, 1575 (N.D. Cal. 1993) ("Although not expressly stated in the opinion, the rule laid down by <u>Franklin</u> appears to be that, under Title IX, damages are available only for intentional discrimination but respondeat superior liability exists, so that an institution is deemed to have intentionally discriminated when one of its agents has done so."), <u>reconsideration granted</u>, ___ F. Supp. ___, 1996 WL 432298 (N.D. Cal. 1996) (adopting Title VII's "knew or should have known" standard). <u>See also</u> <u>Davis v. Monroe County Bd. of Educ.</u>, 74

_____

[2]In <u>Rowinsky v. Bryan Indep. School Dist.</u>, 80 F.3d 1006, 1011 n.11 (5th Cir.), <u>cert. denied</u>, 65 U.S.L.W. 3249 (1996), we suggested that <u>Franklin</u>'s analysis of teacher-student harassment was <u>dictum</u> because the only issue before the <u>Franklin</u> Court was whether Title IX generates any private cause of action for monetary damages. This amounts to <u>dictum</u> within <u>dictum</u> and does not bind us today. Even if we were to decide that <u>Franklin</u> is technically silent on whether there are any situations in which we must allow students to recover damages under Title IX for sexual harassment by teachers, we would follow the unopposed consensus of other jurisdictions that Title IX makes money damages available to students when a school district sexually harasses them.

F.3d 1186, 1192-93 (11th Cir.) (construing <u>Franklin</u> to mean that "a student should have the same protection in school that an employee has in the workplace"), <u>reh'g en banc granted</u>, 91 F.3d 1418 (11th Cir. 1996).  To support their reading of <u>Franklin</u>, these courts often point out that Title IX should have "a sweep as broad as its language."  <u>North Haven Bd. of Educ. v. Bell</u>, 456 U.S. 512, 521 (1982) (quoting <u>United States v. Price</u>, 383 U.S. 787, 801 (1966)).

It is helpful to distinguish pure agency theories from agency-like theories that rely on Title VII's liability scheme.  In <u>Meritor Sav. Bank v. Vinson</u>, 106 S. Ct. 2399, 2408 (1986), the Supreme Court cautioned that "common-law [agency] principles may not be transferable in all their particulars to Title VII."  Courts sometimes conflate these theories.  In <u>Murray v. New York Univ. College of Dentistry</u>, 57 F.3d 243, 249 (2d Cir. 1995), for example, the court cited <u>Meritor</u> for the proposition that "[w]hether the harassing conduct of a supervisor or coworker should be imputed to the employer is determined in accordance with common-law principles of agency."  The thrust of the <u>Murray</u> opinion, however, was not that we should use agency law in Title IX cases, but that we should consider using Title VII's constructive-notice standard.

We address first the suggestion that agency law as such governs private suits under Title IX.  Then we explore separately whether Title VII law, informed by agency principles, imposes a constructive-notice standard on school districts under Title IX.

11

A.

We are not convinced that <u>Franklin</u> instructs us to find school districts vicariously liable whenever an employee intentionally harasses a student because of sex and satisfies the agency rules of § 219 of the <u>Restatement</u>. We have consistently viewed Title IX as Spending Clause legislation. <u>See</u> <u>Leija</u>, 101 F.3d at 398; <u>Rowinsky</u>, 80 F.3d at 1012 n.14; <u>see also</u> <u>Lieberman v. University of Chicago</u>, 660 F.2d 1185, 1187 (7th Cir. 1981) (concluding that Title IX "must be deemed an exercise of Congress' Spending Power" because it was designed to assist educational institutions overcome financial problems), <u>cert. denied</u>, 456 U.S. 937 (1982). The <u>Franklin</u> Court explained that monetary damages are not available for unintentional violations of Title IX because "the receiving entity of federal funds lacks notice that it will be liable for a monetary award." 503 U.S. at 74. "This notice problem does not arise in a case . . . in which intentional discrimination is alleged." <u>Id.</u> at 74-75. Such reasoning militates against the imposition of agency principles. As a statute enacted under the Spending Clause, Title IX should not generate liability unless the recipient of federal funds agreed to assume the liability. In this case, forcing the school district to pay for the unauthorized acts of John Contreras would be using a federal spending statute to create a private cause of action without regard to whether the recipient of the federal funds knew anything about the violation. When the school board accepted federal funds, it agreed not to discriminate on the basis of sex. We think it unlikely that it further agreed to suffer

12

liability whenever its employees discriminate on the basis of sex. Adopting the customary tort paradigm utilized by the district court would compromise Franklin's principle that "legislation enacted pursuant to the spending power is much in the nature of a contract." Pennhurst State School & Hosp. v. Halderman, 451 U.S. 1, 17 (1981).

The text of Title IX gives us further reason to think that the school district did not assume the responsibility to pay damages whenever a teacher sexually harasses a student and falls within the scope of common-law agency rules. While Title VII makes explicit reference to the agents of employers, 42 U.S.C. § 2000e(b), Title IX does not instruct courts to impose liability based on anything other than the acts of the recipients of federal funds. Federal regulations similarly fail to indicate any expectation that school districts will be vicariously liable under Title IX. See 34 C.F.R. § 106.2(h) (1996) (defining "recipient" as the institution, entity, or person that operates an educational program or activity that receives or benefits from federal assistance). A variety of district courts in factually similar cases have shared our reluctance to read the statute and regulations to create vicarious liability. See Wright v. Mason City Community School Dist., 940 F. Supp. 1412, 1420 (N.D. Iowa 1996) (explaining that because grant recipients must have notice of potential liability, Title IX plaintiffs must prove "that the educational institution knew of the harassment and intentionally failed to take the proper remedial measures because of the plaintiff's sex"); Nelson v. Almont

13

Community Schools, 931 F. Supp. 1345, 1354-56 (E.D. Mich. 1996) (rejecting § 219 as a basis for Title IX liability and requiring knowledge of discrimination on the part of the school district); R.L.R. v. Prague Public School Dist I-103, 838 F. Supp. 1526, 1534 (W.D. Okla. 1993) (granting summary judgment to a school district whose basketball coach sexually harassed a student because the student failed to establish a "custom or policy, acquiescence in, conscious disregard of, or failure to investigate or discipline on the part of the School District or any named defendant"); Floyd v. Waiters, 831 F. Supp. 867, 876 (M.D. Ga. 1993) (holding that "common-law agency principles do not apply to claims under Title IX" because Title IX, unlike Title VII, does not refer to "agents").

It is important to note that agency principles would create liability for school districts in virtually every case in which a teacher harasses, seduces, or sexually abuses a student. In addition to § 219(2)(b) of the Restatement, which makes a master liable when he acts negligently, courts could rely on § 219(2)(d), which creates liability whenever the servant is "aided in accomplishing the tort by the existence of the agency relationship." The teacher's status as a teacher often enables the teacher to abuse the student. Whether his power came from the aura of an instructor's authority, the trust that we encourage children to place in their teachers, or merely the opportunity that teachers have to spend time with children, John Contreras's chances of initiating a sexual relationship with an adolescent such as Deborah

14

were enhanced when the school district hired him. But that is not a sufficient reason to think that the school district discriminated on the basis of sex. We conclude that Title IX does not contemplate a theory of recovery based purely on agency law.

B.

In addition to the argument based on the law of agency, the plaintiff urges us to look to Title VII law in applying Title IX. Under Title VII, a plaintiff "can demonstrate constructive notice by 'showing the pervasiveness of the harassment, which gives rise to the inference of knowledge or constructive knowledge.'" Waltman v. International Paper Co., 875 F.2d 468, 478 (5th Cir. 1989) (quoting Henson v. City of Dundee, 682 F.2d 897, 905 (11th Cir. 1982)). Applying this principle here would mean that if the school district should have known about Contreras's abuse, it could be liable on the basis of its constructive notice of sex discrimination. This approach to Title IX teacher-student sexual harassment cases would be less taxing on spending power limits than an approach based purely on agency principles because it would exclude cases in which the only basis of liability is the fact that the teacher uses his authoritative status to harass a student.

Franklin did not establish any sweeping parallel between Title IX and Title VII. Because teachers can abuse their power over students at least as easily as employers can abuse their power over employees, it is understandable that some courts have interpreted Franklin as borrowing from Title VII. See, e.g., Burrow v. Postville Community School Dist., 929 F. Supp. 1193, 1204 (N.D.

15

Iowa 1996) ("The Supreme Court's utilization of its Title VII case law to interpret Title IX in Franklin strongly indicates that Title VII precedent is appropriate for analysis of hostile environment sexual harassment claims under Title IX."); Bosley v. Kearney R-1 School Dist., 904 F. Supp. 1006, 1022 (W.D. Mo. 1995) ("By saying that Meritor . . . gave notice to the defendant school district in Franklin, and by saying that Congress' purpose in enacting Title IX was to prevent federal monies from being used to support intentional discrimination declared unlawful in other statutes, Franklin supports the conclusion that Title VII law provides standards for enforcing the anti-discrimination provisions of Title IX."); Patricia H. v. Berkeley Unified School Dist., 830 F. Supp. 1288, 1293 (N.D. Cal. 1993) ("As the Supreme Court acknowledged in [Franklin], a student should have the same protection in school that an employee has in the workplace."). See also Kinman v. Omaha Public School Dist., 94 F.3d 463, 469 (8th Cir. 1996) (adopting Title VII's "knew or should have known" standard when a student brings a Title IX claim based on sexual abuse by a teacher); Mabry v. State Bd. of Community Colleges & Occupational Educ., 813 F.2d 311, 316 n.6 (10th Cir.) ("Because Title VII prohibits the identical conduct prohibited by Title IX, i.e., sex discrimination, we regard it as the most appropriate analogue when defining Title IX's substantive standards . . . ."), cert. denied, 484 U.S. 849 (1987). We have cited Mabry approvingly and endorsed the view that "Title IX's proscription of sex discrimination, when applied in the employment context, does not differ from Title VII's." Lakoski v.

16

<u>James</u>, 66 F.3d 751, 757 (5th Cir. 1995), <u>cert. denied</u>, 117 S. Ct. 357 (1996). Our actual holding in <u>Lakoski</u>, however, was more modest: "Title VII provides the exclusive remedy for individuals alleging employment discrimination on the basis of sex in federally funded educational institutions." <u>Id.</u> at 753. Before <u>Lakoski</u>, we had stated in <u>Chance v. Rice Univ.</u>, 984 F.2d 151, 153 (5th Cir.), <u>reh'g denied</u>, 989 F.2d 179 (5th Cir. 1993), that employees who bring Title IX claims must rely on Title VI's intentional discrimination standard rather than the more expansive disparate impact standard contained in Title VII. As we explained in <u>Lakoski</u>, 66 F.3d at 758 n.5, we retreated from this position when we denied Chance's petition for rehearing: "In light of the court's factual findings, we conclude that Dr. Chance could not establish a <u>prima facie</u> case of disparate impact sexual discrimination, . . . and we therefore need not decide whether her claim should have been analyzed under that standard." 989 F.2d at 180. Whatever precedential weight the first <u>Chance</u> opinion retains, and whatever the persuasive power of <u>Lakoski</u>, those cases concerned discrimination in employment. Neither case addressed the question of whether a school district can be liable either vicariously or on a constructive-notice theory under Title IX when a teacher harasses a student.

We recognize the effort to end discrimination in education and have acknowledged the importance of applying equal protection law in schools as well as in the workplace to protect students from sexual predators such as John Contreras. <u>Doe v. Taylor Indep.</u>

17

<u>School Dist.</u>, 975 F.2d 137, 149 (5th Cir. 1992), <u>cert. denied</u>, 506 U.S. 1087 (1993).[3]  That said, we cannot take liberties with statutory language or with the reasoning of the Supreme Court. <u>Franklin</u>'s single citation to <u>Meritor Savings</u> to support the Court's conclusion that sexual harassment is sex discrimination does not by itself justify the importation of other aspects of Title VII law into the Title IX context.  We can find nothing in <u>Franklin</u> to support the trial court's theory that Title IX can make school districts liable for monetary damages when the district itself engages in no intentional discrimination.  There is nothing to suggest that Congress intended such a sweeping liability.  More to the point, there is nothing to give notice to the recipient of federal funds that the funds carry the strings of such liability.  To ignore this reality is to ignore that Congress acted here under the spending power.

Under Title VII law, an employer has constructive notice of sexual harassment if it "knew or should have known" that the harassment was taking place.  <u>Farpella-Crosby v. Horizon Health Care</u>, 97 F.3d 803, 806 (5th Cir. 1996).  In other words, if an employer fails to exercise reasonable care in learning of sexual harassment by employees, Title VII treats the employer as if it had actual notice of the harassment.  As other courts have remarked,

---

[3]We note that students abused by teachers in public schools have some degree of protection under federal statutes.  If the teacher acts under color of state law in pursuing a sexual relationship with a student, the student can rely on 42 U.S.C. § 1983 for recovery.  <u>See</u> <u>Doe v. Rains County Indep. School Dist.</u>, 66 F.3d 1402, 1406-07 (5th Cir. 1995).

the constructive-notice standard is essentially grounded in negligence. See Guess v. Bethlehem Steel Corp., 913 F.2d 463, 465 (7th Cir. 1990) (explaining that an employer's liability for hostile-environment sexual harassment is based on "a negligence standard that closely resembles the 'fellow servant' rule" rather than on respondeat superior); Bruneau v. South Kortright Central School Dist., 935 F. Supp. 162, 173 (N.D.N.Y. 1996) (refusing to use Title VII's constructive-notice standard in a student-on-student Title IX harassment case because "[c]onstructive notice . . . is, in essence, a negligence standard").

Although the school district may be somewhat less vulnerable under the constructive-notice standard than under the pure agency standard, we think that importing this aspect of Title VII law stretches Title IX beyond its language and purpose. Congress did not enact Title IX in order to burden federally funded educational institutions with open-ended negligence liability.

In prohibiting employment discrimination, Title VII establishes limits on liability to ensure that private actions against employers do not become excessive. See 42 U.S.C. § 1981a (establishing monetary ceilings on compensatory damages for private actions brought under Title VII or under the Americans with Disabilities Act);[4] 42 U.S.C. § 2000e-5 (setting out detailed

[4]Because Congress added these caps on damages to Title VII in 1991, the limitation on employers' liability does not illuminate Congress's understanding when it passed Title IX in 1972. The omission of Title IX from § 1981a may suggest, however, that in 1991 Congress did not view Title IX as the kind of legislation that could generate expansive liability. Of course, the availability of money damages under Title IX was an open question until 1992, when

procedures under Title VII for the EEOC and for private claimants, including a statute of limitations of less than one year). Employers have the benefit of detailed regulations that can help them avoid illegal employment practices. See 29 C.F.R. §§ 1600-1691. Title VII regulations state forthrightly that "an employer . . . is responsible for its acts and those of its agents and supervisory employees with respect to sexual harassment . . . ." 29 C.F.R. § 1604.11. Title IX, by contrast, does not create any administrative body to regulate private claimants' rights, and the regulations promulgated under Title IX make no mention of sexual harassment. See 34 C.F.R. §§ 106.1-106.71 (Title IX regulations); 34 C.F.R. §§ 100.6-100.11 (Title VI procedural regulations incorporated by reference into Title IX regulations). As Franklin teaches, this does not mean that private parties may not recover damages under Title IX for sexual harassment. Rather, it means that we should be reluctant to treat Title IX's anti-discrimination provisions in the same way that we treat Title VII's provisions.

Our recent decision in Rowinsky v. Bryan Indep. School Dist., 80 F.3d 1006 (5th Cir.), cert. denied, 117 S. Ct. 165 (1996) supports our conclusion that Title IX requires a showing of actual, intentional discrimination on the part of the school district. The plaintiff in Rowinsky argued that Title IX requires a school

the Supreme Court handed down Franklin. But this sequence of events does not undermine our view that Title IX does not create negligence liability on the part of educational institutions. Rather, it supports our contention that Franklin did not sanction private Title IX actions when the educational institution itself has not intentionally discriminated.

20

district to pay money damages when it permits students to harass one another based on sex. We held that Title IX does not authorize damages for student-on-student sexual harassment "absent allegations that the school district itself directly discriminated based on sex." 80 F.3d at 1008. We reserved the question of whether the district can discriminate vicariously through its agents. See id. at 1011 n.10.[5] But we examined Title IX's structure and legislative history and concluded that the statute is "not a panacea for all types of sex discrimination, but rather a limited initial attempt to end discrimination by educational institutions." Id. at 1014. As a tool for curbing discrimination in education, Title IX merely places conditions on the recipients of federal funds. We pointed out in Rowinsky that if the acts that create liability are likely to occur and are out of the control of the school district, the grant recipients might prefer to decline the federal money. Id. at 1013. The same reasoning applies in this case. Unfortunately, it is increasingly evident from our docket that sexual harassment and molestation of students by

---

[5]The dissenting member of the Rowinsky panel cited Franklin to support his view that a school district is subject to liability when it actually knows of student-on-student sexual harassment and fails to take appropriate corrective action. Id. at 1023-24 (Dennis, J., dissenting). In response, the panel majority asserted that "sexual harassment by a teacher falls within the framework of Meritor because a teacher is an employee of the grant recipient. Thus, like the normal sexual harassment case, it is an agent of the defendant who is guilty of the harassment." Id. at 1011 n.11. Not only was this assertion dictum, but it failed to counter the dissent's line of argument, which relied on the school board's actual knowledge of the harassment rather than on the notion that a student could be an agent of the school district. See id. at 1020 n.7 (Dennis, J., dissenting).

21

teachers is not uncommon and may be a widespread phenomenon. It is unlikely that when Congress enacted Title IX, it wanted to make funding contingent upon whether a school district succeeds in preventing teachers from cultivating covert sexual relationships with students. Some might suggest that the approach we adopt today creates incentives for school boards to stick their heads in the sand. Our response is two-fold. First, we are not writing here as a common-law court. We are interpreting a federal statute. Second, school boards that adopt a head-in-the-sand policy would be foolish indeed, morality aside, because they would encounter other problems, such as the threat of liability under 42 U.S.C. § 1983.

The Department of Education's Office of Civil Rights has recently issued proposed guidelines that conflict with our analysis of tort liability under Title IX. See 61 Fed. Reg. 52,172 (October 4, 1996) ("Sexual Harassment Guidance: Harassment of Students by School Employees"); 61 Fed. Reg. 42,728 (August 16, 1996) ("Sexual Harassment Guidance: Peer Sexual Harassment"). These guidelines advocate the adoption of Title VII principles in cases such as this one: "a school will be liable for sexual harassment of its students by its employees if the school has notice of the harassment (i.e. knew or should have known of the harassment) but failed to take immediate and appropriate steps to remedy it." 61 Fed. Reg. at 52,173.[6] In general, "[w]hen interpreting title IX we accord the

---

[6]The guidelines' understanding of Title VII law, however, is so expansive that it is difficult to distinguish from the agency theory we discuss above in Part II.A. See 61 Fed. Reg. 52,172, 52,177 ("[S]o long as an agent or responsible employee of the recipient received notice, that notice will be imputed to the

22

OCR's interpretations appreciable deference." <u>Rowinsky</u>, 80 F.3d at 1015 n.20.   <u>See also</u> <u>Leija</u>, 101 F.3d at 406 (Dennis, J., dissenting) (urging adoption of the OCR's proposed guidelines). But we cannot apply these guidelines retroactively.   As we have explained, recipients of Title IX funds are bound by their agreement with the federal government.   The government can add strings to the Title IX funds as it disburses them.   But it cannot modify past agreements with recipients by unilaterally issuing guidelines through the Department of Education.   As far as this case is concerned, the proposed guidelines do not apply.   We make no comment on how these guidelines might affect cases in which a school district accepts Title IX funds after the guidelines' promulgation date.

### III.

Having rejected the pure agency and constructive-notice theories, we are left with the rule that a school district is not liable under Title IX for a teacher's sexual harassment unless it has actual notice of the harassment.   In order to flesh out the notion of actual notice, we borrow from recent discussions of the concept of deliberate indifference.   Although these cases arose in very different areas of substantive law, they share with this case the problem of grasping what it means to harm someone intentionally by disregarding her plight.

---

recipient."); <u>id.</u> at 52,172-73 ("A school's liability for sexual harassment by its employees is determined by application of agency principles, i.e., by principles governing the delegation of authority to or authorization of another person to act on one's behalf." (footnote omitted)).

In <u>Farmer v. Brennan</u>, 114 S. Ct. 1970 (1994), the Supreme Court faced the question of what sort of conduct should count as deliberate indifference when an inmate brings a civil suit against prison officials for prison conditions that violate his Eighth Amendment rights. Deliberate indifference falls generally within the category of recklessness. <u>Id.</u> at 1978. But the Court recognized a distinction between recklessness as "fail[ing] to act in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known" and recklessness as disregarding a risk of harm that is actually known. <u>Id.</u> at 1978-79. The former amounts to objective recklessness, the latter to subjective recklessness. The Court adopted the subjective standard: "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." <u>Id.</u> at 1979. It considered an objective, constructive-notice standard, <u>id.</u> at 1980-81 (discussing <u>City of Canton v. Harris</u>, 489 U.S. 378 (1989)), but it concluded that such a standard is not appropriate because the liability of prison officials does not turn on inadequate training or supervision. <u>Id.</u> at 1981. Instead, it turns on whether the officials have punished the prisoner, and "prison officials who lack[] knowledge of a risk cannot be said to have inflicted punishment." <u>Id.</u> at 1982. We have recently followed the <u>Farmer</u> standard in analyzing jail officials' liability under the Due Process Clause for jail conditions imposed on pretrial detainees.

24

<u>Hare v. City of Corinth</u>, 74 F.3d 633, 648–50 (5th Cir. 1996) (en banc).

These cases construing the test for deliberate indifference are helpful because they highlight the distinction between an intentional wrong and a wrong that flows from mere neglect. As we have explained, Title IX liability depends on a school district's act of discriminating on the basis of sex. Just as a prison official has not punished an inmate unless he actually knows of a danger to the inmate and chooses not to alleviate the danger, a school district has not sexually harassed a student unless it knows of a danger of harassment and chooses not to alleviate that danger. Although drawn from a different body of law, <u>Farmer</u> and <u>Hare</u> clarify the indispensable role that deliberate action plays when liability stems from intentional conduct such as punishing or discriminating.

The reasoning in <u>Farmer</u> and <u>Hare</u> also clarifies what a school district must know before being held liable. Students need not show that the district knew that a particular teacher would abuse a particular student; the plaintiff could prevail in this case, for example, by establishing that the school district failed to act even though it knew that Contreras posed a substantial risk of harassing students in general. But Title IX liability for sexual harassment will not lie if a student fails to demonstrate that the school district actually knew that the students faced a substantial threat of sexual harassment. In other words, the district can escape liability if it can show "that [it] did not know of the

25

underlying facts indicating a sufficiently substantial danger and that [it was] therefore unaware of a danger, or that [it] knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." Farmer, 114 S. Ct. at 1982. Any lower standard would veer in the direction of an objective test, which is necessarily "redolent with negligence and its measures." Hare, 74 F.3d at 650.

IV.

One major question remains before we can resolve this appeal. To this point, we have referred simply to the school district's knowledge and the school district's actions. But the district knows and acts only through individuals, whether they be members of the school board, administrators at particular schools, or classroom teachers. We have yet to decide which individuals within the school district must have known of Contreras's abuse of Deborah in order for us to conclude that the school district knew of the abuse.

At one end of the spectrum, liability might lie only when a member of the school board actually knows of the abuse and fails to take prompt remedial action. Under this rule, a school district would virtually never face penalties for sexual abuse of students unless school board members themselves intended the harm. By the same token, victims of abuse would virtually never be able to recover, especially in large school districts, in which school board members have little contact with the day-to-day interactions between teachers and students. At least one court seems to have

26

adopted such a rule.  See Floyd v. Waiters, 831 F. Supp. 867, 876 (M.D. Ga. 1993) ("This court finds no basis for plaintiffs' Title IX claim.  Assuming that [the school security guard's] assaults on plaintiffs constitute discrimination based upon sex, the Board had no part in this discrimination.").  At the other end of the spectrum, liability might lie whenever any school employee other than the perpetrator has actual knowledge of the abuse and fails to take prompt remedial action.  Although more protective of victims of abuse, this scheme would vitiate the premise that has guided our analysis of Title IX sexual-abuse cases: that Title IX creates liability for school districts only when the school district intentionally breaks the strings attached to those funds.

Formulating the sort of meaningful tort liability envisaged by the Franklin Court while recognizing that Title IX generates liability only for intentional wrongs requires us to chart a middle way between these extremes.  As we noted in Leija, 101 F.3d at 401, school districts contain a number of layers of responsibility below the school board: superintendents, principals, vice-principals, and teachers and coaches, not to mention specialized counselors such as Title IX coordinators.  Different school districts may assign different duties to these positions or even reject this traditional hierarchical structure all together.  We do not wish to restrict the applicability of our analysis by keying liability to certain job titles within the school system.  Whether the school official is a superintendent or a substitute teacher, the relevant question

27

is whether the official's actual knowledge of sexual abuse is functionally equivalent to the school district's actual knowledge.

We hold that a school district can be liable for teacher-student sexual harassment under Title IX only if a school official who had actual knowledge of the abuse was invested by the school board with the duty to supervise the employee and the power to take action that would end such abuse and failed to do so. This inquiry circumscribes those school employees in the chain of command whom the school board has appointed to monitor the conduct of other employees and, as distinguished from reporting to others, remedy the wrongdoing themselves. At the same time, it locates the acts of subordinates to the board at a point where the board's liability and practical control are sufficiently close to reflect its intentional discrimination. It does so by omitting the bulk of employees, such as fellow teachers, coaches, and janitors, unless the district has assigned them both the duty to supervise the employee who has sexually abused a student and also the power to halt the abuse.

This middle ground parallels the Title VII standard for when an employee's knowledge of workplace harassment counts as knowledge on the part of the employer. Under Title VII, "immediate supervisors are Employers when delegated the employer's traditional rights, such as hiring and firing." Harvey v. Blake, 913 F.2d 226, 227 (5th Cir. 1990). In order to prevent Title VII liability, these supervisors "must take prompt and appropriate remedial action, 'reasonably calculated' to end the harassment." Waltman v.

28

International Paper Co., 875 F.2d 468, 479 (5th Cir. 1989) (quoting Jones v. Flagship Int'l, 793 F.2d 714, 719-20 (5th Cir. 1986), cert. denied, 479 U.S. 1065 (1987)).

To some extent, Title VII cases may be helpful in determining which school officials make personnel decisions on behalf of the school board.  But our willingness to hold a school district liable based on the intentional inaction of its supervisory employees does not mean that Title IX claims are governed by Title VII law.  When a school board confers on a school official the power to take such personnel actions, it makes a deliberate, considered judgment about what sort of leadership the district should have; it decides who acts for the board.  We have rejected the agency theory and Title VII's constructive-notice theory because they violate the principle that penalties for failures to comply with conditions on the disbursement of Spending Clause funds are contractual in nature. Without notice of potential liability for the negligence of supervisory employees, the government may not impose damages on a school board based on its acceptance of Title IX funds.  However, the connection to board action is stronger and the need for notice of potential liability weaker when the board projects its authority by granting an employee the power to hire, fire, and make other employment decisions.  Neither the text of Title IX nor the Franklin decision gave the board notice that the district would be liable for Contreras's sexual abuse, even if the district's management was negligent.  But Franklin's endorsement of a private cause of action should have put the board on notice that it would

be liable if it installed school leadership that intentionally discriminated on the basis of sex. Reading <u>Franklin</u> to impose liability only where the board itself knows of a student's sexual harassment at the hands of a teacher would make the private cause of action nearly meaningless.

As in Title VII cases, "[w]hat is appropriate remedial action will necessarily depend on the particular facts of the case — the severity and persistence of the harassment, and the effectiveness of any initial remedial steps." <u>Waltman</u>, 875 F.2d at 479. Of course, prompt termination or suspension of the offender would ordinarily be sufficient. In some situations, transferring the teacher to another school might be adequate. But merely reporting the abuse to superiors or to law enforcement is insufficient. Anyone can make reports. Indeed, Texas law imposes a duty to report child abuse. <u>See</u> Tex. Fam. Code Ann. § 261.101(a) (West 1996) (requiring an immediate report to state authorities by any "person having cause to believe that a child's physical or mental health or welfare has been or may be adversely affected by abuse or neglect"); <u>id.</u> § 261.101(b) ("If a [teacher] has cause to believe that a child has been or may be abused or neglected, the [teacher] shall make a report not later than the 48th hour after the hour the [teacher] first suspects that the child has been or may be abused or neglected."). In order to qualify as a supervisory employee whose knowledge of abusive conduct counts as the district's knowledge, a school official must at least serve in a position with the authority to "repudiate that conduct <u>and</u> eliminate the hostile

30

environment" on behalf of the school district. <u>Nash v. Electrospace System, Inc.</u>, 9 F.3d 401, 404 (5th Cir. 1993) (per curiam) (emphasis supplied).

                                    V.

By instructing the jury that the school district could be liable for the negligence of its employees, the district court misstated Title IX law. Consequently, we reverse the judgment.

Finally, we note that the district court's jury instructions did not confine any award of damages to the acts of discrimination chargeable to the school district. Under the standard we announce today, the school district can be liable, if at all, only for the damages caused by its intentional acts of discrimination. If the conduct has ceased by the time a supervisory employee of the sort we describe here learns of it, there is no liability in a private suit for that conduct based on some personal failure to take "proper remedial action" thereafter.

REVERSED AND REMANDED.