NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-3541
_____

C. K.,
            Appellant

v.

HOPE WRYE,
Individually and in her official capacity;
CENTRAL INTERMEDIATE UNIT #10;
PHILIPSBURG-OSCEOLA AREA SCHOOL DISTRICT
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 4-15-cv-00280)
District Judge:  Hon. Matthew W. Brann
_____

Submitted Under Third Circuit LAR 34.1(a)
September 11, 2018

Before:  JORDAN, VANASKIE, and NYGAARD, *Circuit Judges*

(Filed: September 26, 2018)
_____

OPINION*
_____

---

* This disposition is not an opinion of the full court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

JORDAN, *Circuit Judge*.

C.K. appeals from the District Court's order granting summary judgment in favor

of an educational services agency called the "Central Intermediate Unit #10" ("CIU") and

Philipsburg-Osceola Area School District ("POASD") (together with CIU, the

"institutional defendants") on his Title IX claim for sexual harassment arising out of a

sexual relationship he had with Hope Wrye, a former CIU employee and teacher's aide in

the high school C.K. attended. Because genuine disputes of material fact exist as to the

institutional defendants' knowledge of Wrye's relationship with C.K., we will vacate the

District Court's judgment on his Title IX claim and remand for further proceedings.

## I.    BACKGROUND[1]

C.K. enrolled in Philipsburg-Osceola Area High School (the "High School") as a

freshman at the beginning of the 2000-2001 school year. He transferred to another

school district in February 2001 but returned to POASD in November 2001, where he

remained until he dropped out of the High School in October 2002.

From August 2000 to February 2001, C.K. was enrolled in Larry Krest's

emotional support class at the High School, where Wrye was a teacher's aide. Beginning

in early 2001, before C.K. transferred out of the district, he and Wrye began having a

physical relationship. By the spring of 2001, C.K. and Wrye were repeatedly engaging in

intercourse. Their sexual encounters continued throughout C.K.'s second enrollment at

_____

[1] The facts described here come from the summary judgment record before the
District Court. We note that the institutional defendants dispute many of the facts
recounted here. We review the record, however, in the light most favorable to C.K. *See
infra* note 6.

2

the High School.[2]  In December 2002, after C.K. had dropped out of school, Wrye

became pregnant as a result of her relationship with C.K.  Their child was born in 2003.

Wrye's interactions with C.K. and other students ultimately resulted in an

investigative meeting with CIU and POASD officials.  The parties dispute what

information prompted the meeting, when the meeting occurred, who was in attendance,

what was discussed, and what the consequences of that meeting were.

## A.    The Lead Up To The Meeting

Barbara Neff, a cafeteria worker at the High School, was Wrye's neighbor during

the relevant time period.  She recalled seeing C.K. "spend many evenings and weekends

[at Wrye's home,]" (App. at 88-89), and observed them engaging in "physical contact,

kissing, hugging," (App. at 90-91).  Neff recalled that she might have reported her

observations to the physical education teacher at the school as well as another teacher's

assistant.  She said that she did not discuss the kissing with the physical education

teacher, but could not recall whether she discussed it with the teacher's assistant.  She did

not report her observations to any administrative officials.

Hugh Dwyer (the current Executive Director for CIU)[3] testified that he had been

informed that the investigative meeting occurred "the same day as the report from Ms.

---

[2] Wrye testified that she did not have any romantic involvement with C.K. until November 2001.

[3] Dwyer was not employed by CIU at the time of the events in question.  But the institutional defendants do not dispute C.K.'s assertion that we can consider Dwyer's testimony as an admission by a party opponent pursuant to Federal Rule of Evidence 801(d)(2); they only contest the weight a factfinder should afford it, given that he has no first-hand knowledge of what transpired.

3

Wrye's neighbor … concerning her suspicions about Hope Wrye and a student," (App. at 921), but that he did not remember where that information came from. That sequence of events also was supported by Wrye, who testified that the meeting was prompted by "the Barb Neff allegation thing[.]" (App. at 565.)

But Gary Springer (special education supervisor for POASD) and Kerri Bloom (special education supervisor with CIU), who were also reported to have been at the meeting, did not recall that Neff's accusations prompted the meeting. Springer said that he did not "remember exactly where [the information] came from[,]" that "it was grapevine hearsay that got back to [him] that an aide … in a CIU-operated emotional support classroom had been giving students a ride in her personal vehicle after school hours." (App. at 720.) And Bloom recalled that the meeting was called by the superintendent of the school district who had received a "gossipy report about one of our assistants, the assistant in Larry Krest's classroom and one of the students[.]" (App. at 745.)

### B.     When The Meeting Occurred

There is no dispute that the meeting occurred, only about when it occurred. Dennis Shanafelt (assistant executive director for CIU) recalled that the meeting occurred in 2000, while Springer testified that the meeting occurred sometime between 2000 and 2001. Krest remembered the meeting as taking place sometime between 2001 and 2002. Viewing the record in the light most favorable to C.K., we will assume for purposes of this appeal that the meeting occurred sometime between 2000 and 2001, after Neff's allegations came to light.

### C. Who Attended The Meeting

There is no dispute that Wrye, Shanafelt, Charles Young (principal of the High School), and Bloom attended the meeting. Springer did not recall being at the meeting, although Young and Bloom said he was there. Viewing the record in the light most favorable to C.K., we will assume that Wrye, Shanafelt, Young, Bloom, and Springer all attended the meeting.

### D. What Was Discussed At The Meeting

The majority of accounts recollected that the meeting focused on Wrye's practice of giving students car rides, including C.K. Springer, who does not recall attending the meeting, remembered others reporting that Wrye "was questioned about transporting students after school hours …[,] that she admitted that she did do that, that she had been giving the students a ride home." (App. at 419.)

Meanwhile, Bloom recalled discussing "the assistant in Larry Krest's classroom and one of the students," (App. at 499), and "some sort of inappropriate relationship[]" or friendship with a "male student," (App. at 506), including the fact that Wrye was seen with a student in her car and home.

Wrye, however, testified that they discussed how someone "saw [her] with a student or kissing a student, … which [she thought] was the Barb Neff allegation thing." (App. at 78.) Wrye did not recall that the administration officials identified the student she was allegedly kissing. Krest likewise remembered that Wrye had told him after the meeting that "the principal accused her of having an affair with one of her students."

5

(App. at 104.) He said that "[Wrye] indicated the principal claimed the allegations against [her] were made by a female cafeteria worker." (App. at 104.)

Bloom, Young, and Springer all testified that when Wrye was confronted by allegations that she was seen in her car with C.K., Wrye stated that she was a friend of C.K.'s mother and that, to help her, she was giving him rides home. That explanation, as well as her standing in the community and the fact she was married with children, prompted Young to conclude that there was no reason to be concerned about sexual impropriety. Young, Bloom, and Wrye all remembered that Wrye was upset during the meeting and agitated that someone would claim she was involved in inappropriate behavior with a student.

### E. Consequences Of The Meeting

At the conclusion of the meeting, there was a consensus that Wrye would not come to school for a few days. Bloom, for example, remembered that Wrye was given some time off to allow everyone to calm down. Wrye, meanwhile, testified that she was "suspended with pay." (App. at 565.) Krest also remembered that, as a disciplinary action, Wrye was asked not to attend school. Bloom additionally recalled that Wrye was assigned to a different classroom following the meeting. But Shanafelt testified that he did not remember that Wrye got suspended and that he did not remember that Wrye was moved to a different classroom.

6

## II. PROCEDURAL HISTORY

C.K. initiated this lawsuit in February 2015 and filed a five-count second amended complaint in October 2015.[4]  The institutional defendants moved for summary judgment on C.K.'s claim brought pursuant to 42 U.S.C. § 1983 (Count II) and his Title IX claim brought pursuant to 20 U.S.C. § 1681 (Count III).  The District Court granted those motions, determining that no reasonable jury could conclude that the institutional defendants had actual notice that Wrye posed a substantial danger to students.  C.K. has only appealed the ruling on the Title IX claim. [5]

---

[4] Counts I, IV, and V were brought against Wrye and are not relevant to this appeal.

[5] CIU argues that because C.K. did not appeal the District Court's ruling on his § 1983 claim, he has waived his right to appeal the Title IX claim.  We disagree.  Title IX claims are not mere duplicates of § 1983 claims.  *See Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 256 (2009) (explaining in comparison to § 1983 that "Title IX's protections are narrower in some respects and broader in others").  A plaintiff unsuccessful before a trial court does not have to appeal the two claims in unison.  He can choose to appeal one, the other, or both without waiving any appellate rights as to the claims he chooses to pursue on appeal.  *Cf. Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 279-80 (1998) (entertaining a plaintiff's appeal on a Title IX claim when the plaintiff did not also appeal an adverse ruling on a § 1983 claim).

## III. DISCUSSION[6]

C.K. argues that the District Court erred in granting summary judgment in favor of the institutional defendants on his Title IX claim, contending that it improperly weighed the record evidence instead of drawing all justifiable inferences in his favor. He asserts that the District Court thereby wrongly concluded that there were no genuine disputes of material fact. We agree with C.K. that genuine disputes of material fact exist such that summary judgment on the Title IX claim was not appropriate.

Title IX states that "[n]o person … shall, on the basis of sex, … be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]" 20 U.S.C. § 1681. To prevail against an educational institution or entity under Title IX based on sexual harassment by a teacher, a plaintiff must show that an "appropriate person" at the school had "actual notice" of the discriminatory conduct and was deliberately indifferent to it. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 277, 285, 290 (1998); *Bostic v. Smyrna Sch. Dist.*, 418 F.3d 355, 360 (3d Cir. 2005). An appropriate person is an "official who at a minimum has authority to address alleged discrimination and to institute corrective measures on the … [district's] behalf." *Bostic*, 418 F.3d at 360 (alterations in original) (citation omitted). No one disputes that there

---

[6] The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1367. We have jurisdiction pursuant to 28 U.S.C. § 1291. Our review of a grant of summary judgment is plenary. *Deweese v. Nat'l R.R. Passenger Corp. (Amtrak)*, 590 F.3d 239, 244 n.8 (3d Cir. 2009). Summary judgment is appropriate if there are no genuine disputes of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). In reviewing a summary judgment ruling, we consider the record in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 248-49.

were "appropriate persons" at the relevant meeting. Rather, the parties dispute only whether the institutional defendants had "actual knowledge" of the danger Wrye posed to students.

An educational institution has "actual knowledge" if it is aware of known acts of discrimination. *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 643 (1999); *Bostic*, 418 F.3d at 361. The known acts must alert the school to more than a mere "possibility" that a teacher is behaving inappropriately with a student. *Bostic*, 418 F.3d at 360-61. But a school will be held to have actual knowledge if it is aware of facts that demonstrate that a specific teacher poses a substantial danger to a student. *Id.* at 361. The law does not require facts demonstrating that the appropriate persons had actual knowledge of the specific inappropriate relationship. *Rosa H. v. San Elizario Indep. Sch. Dist.*, 106 F.3d 648, 659 (5th Cir. 1997). It is sufficient if the school district had actual knowledge that a teacher "posed a substantial risk of harassing students in general." *Id.*

The record here, viewed in the light most favorable to C.K., could support a factfinder's determination that the institutional defendants had actual knowledge that Wrye posed a substantial danger to C.K. and other students and that the institutional defendants were indifferent to that fact. Evidence plausibly supports that (i) a meeting with school officials was prompted by an allegation that Wrye was seen with a male student at her home on multiple occasions and that she was seen kissing that student, (ii) the meeting was held while C.K. was still a student and it was attended by "appropriate persons," (iii) the meeting involved discussions of an "affair" with a student and inappropriate behaviors, including kissing, (iv) the institutional defendants made no

9

serious effort to ensure that Wrye ceased engaging in inappropriate behavior with students, and (v) Wrye continued to have a sexual relationship with C.K. after that meeting occurred. If a factfinder credited the record evidence that supports the chain of factual conclusions above, it could reasonably decide that the institutional defendants had actual knowledge that Wrye posed a substantial danger to students and that they were deliberately indifferent to that risk.

That is not to say, however, that the record can support only that conclusion. The record also includes evidence that supports the institutional defendants' positions. But making credibility determinations and weighing evidence must be reserved for the factfinder. *See Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (explaining that the court must draw "all justifiable inferences… in [the non-movant's] favor" and must not "make credibility determinations or engage in any weighing of the evidence" (citation omitted)). Here, several genuine disputes of fact exist that must be resolved by a factfinder, including: when the meeting occurred, what prompted the meeting, who was at the meeting, what was discussed at the meeting, and the outcome of the meeting. C.K. may or may not ultimately prevail, but his Title IX claim is not, on this record, susceptible to summary judgment.

## IV.   CONCLUSION

We will therefore vacate the District Court's grant of summary judgment in favor of the institutional defendants on C.K.'s Title IX claim and remand for further proceedings.

10