# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

November 14, 2022

Lyle W. Cayce
Clerk

No. 20-20657

JANE ROE,

*Plaintiff—Appellant*,

*versus*

CYPRESS-FAIRBANKS INDEPENDENT SCHOOL DISTRICT,

*Defendant—Appellee*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:18-CV-2850

Before DENNIS, ELROD, and DUNCAN, *Circuit Judges*.
JENNIFER WALKER ELROD, *Circuit Judge*:

Jane Roe alleges that when she was fourteen years old, she was brutally sexually assaulted by another student in a stairwell at Cypress Creek High School, following an abusive relationship with the same student. After suffering severe injuries and weathering subsequent harassment, Roe says that instead of investigating her assault and providing her with academic or other appropriate support, Cypress Creek recommended that she drop out of school. After doing so—and never returning to any high school—Roe sued the school district under Title IX, arguing that it was deliberately indifferent both to the risk of her sexual assault and in response to her abusive

No. 20-20657

relationship, sexual assault, and subsequent related harassment and bullying on school property. The district court granted Cypress Creek's motion for summary judgment, and Roe now appeals from that decision. We affirm in part and reverse in part. Because the district court correctly concluded that the District was not deliberately indifferent to Roe's risk of sexual assault, we AFFIRM that portion of the judgment. However, because a reasonable jury could find that the District was deliberately indifferent to the totality of the harassment at issue here, we REVERSE that portion of the judgment.

I.

Jane Roe and John Doe began dating in middle school. Their relationship continued into high school at Cypress Creek, where it grew increasingly dysfunctional over the course of their freshman year. Among other things, Roe and Doe began engaging in sexual activity in school stairwells. They argued frequently and publicly. If Roe looked at anyone else, Doe would grab her arm. And if he thought her clothes were too revealing, he would make her wear his jacket. Doe would make her hug or kiss him before leaving his side, and he "mark[ed] his territory" by leaving large hickies on her neck. According to Roe's mother, Doe isolated Roe from her friends and family, in part by keeping tabs on her location and discouraging her from participating in sports and other extra-curricular activities. Roe's grades steadily declined during this time.

Roe's mother did not like Doe and his control over her daughter. But when she forbade Roe from seeing him, Roe retaliated by cutting herself. In December of her freshman year, Roe was diagnosed with bipolar disorder and treated at a hospital for two weeks. Roe's mother spoke to Cypress Creek assistant principal Carol Gibson and other district administrators several times that year to express her concern regarding the relationship between Roe and Doe, and his controlling behavior. According to Roe's mother, she

told Gibson that Doe was "controlling, emotionally abusive[,] and possibly physically abusive." The school refused to help. Her prior efforts unavailing, Roe's mother arranged a meeting for herself, Roe, Gibson, and other district administrators in March of 2014. At the meeting, she pleaded with the school to change Roe's schedule to keep her away from Doe. When they refused, Roe's mother recalls telling the administrators that "[Doe is] going to end up hurting [Roe]." Just six days later, on March 10, Roe and Doe met in the hallway after school dismissed. Doe walked Roe to an after-school math tutorial, but Roe left after 15 minutes to rejoin Doe. They then walked into a stairwell where they frequently engaged in sexual activity.[1] Doe began touching Roe and—at some point—shoved his fist into her vagina, lifting her off the ground. Roe began to bleed profusely. She walked out of the stairwell with Doe, threw away her blood-soaked spandex in the bathroom, and called her grandfather to pick her up. When Roe's grandfather arrived to take her home, Roe—explaining that she was having "female issues"—sat on a binder to keep blood from ruining the seat in his car. When the pain did not abate several hours later, her mother called their pediatrician for advice. Roe finally told her mother what had happened, and they went to the emergency room. Roe, who we reiterate was only fourteen at the time, underwent two surgeries over the next few days as a result of the violent encounter.

Roe checked in to the hospital at around 10:00 p.m. The hospital called campus police, and two officers arrived a short time later. The hospital also conducted a "Sexual Assault Nurse Examiner" (SANE) exam, which, due to the extent of Roe's injuries, was postponed until she went into surgery shortly thereafter. Campus police returned to the hospital at around 3:30

---

[1] Roe has presented evidence that it was well-known to both Cypress Creek students and employees that students would regularly engage in sexual activity in the stairwells, which were not monitored by cameras or school employees.

No. 20-20657

a.m. to follow up and collect the SANE forensic documents (but not the photographs of Roe's injuries). Campus police spoke to Roe about what happened immediately after she came out of surgery at 3:30 am, while she was still under the effects of anesthesia. Roe says that she does not remember what she told the hospital or the police.

According to the post-surgery police report, Roe told police that she and Doe were "fooling around" when Doe shoved his "entire hand" into her vagina. And medical records relate that "events were reported to be consensual," Roe "allowed [Doe] to put his entire hand into her vagina," and Roe "state[d] she was not assaulted but agreed to the act." However, these post-surgery statements conflict with Roe's later denials, including her statement given to a Sheriff's deputy about a month later that when "I tried to go [back] to tutoring[,] he pulled me back and he just shoved his whole fist up me . . . from the back" and that "I didn't want him to do it."[2] Left unreported was that Roe was pregnant at the time of the assault. Roe's mother believed that Doe intentionally injured Roe in order to cause her to miscarry.

---

[2] Even assuming that Roe—merely hours from assault and minutes from surgery—did report initially that the encounter was consensual, there are numerous reasons why she might have inaccurately said so, including shock, fatigue, shame, the desire to protect Doe, or some combination of the above. *See* "Fast Facts: Preventing Sexual Violence," CTRS. FOR DISEASE CONTROL AND PREVENTION (last updated June 22, 2022), https://www.cdc.gov/violenceprevention/sexualviolence/fastfact.html; "Why Don't They Tell? Teens and Sexual Assault Disclosure," Nat'l Child Traumatic Stress Network (last visited Oct. 27, 2022), extension://oemmndcbldboiebfnladdacbdfmadadm/https://www.nctsn.org/sites/default/files/resources/fact-sheet/why_dont_they_tell_teens_and_sexual_assault_disclosure.pdf.

In any event, there are fact issues about whether anyone with the District ever received any report from either the campus police or the Sheriff, including the dueling statements in the respective reports about whether the encounter was consensual. *Infra* Part III.B.

The next day, a campus officer arrived at the school and watched the available video footage, which only showed Roe and Doe walking in the hallway after school had dismissed and before Roe attended her tutorial. A few days later, on March 21, campus police turned its documents and the video footage over to the Harris County Sheriff's Office. After obtaining this evidence, the Sheriff's Office interviewed Roe and her mother. Despite Roe's vigorous denial, the District Attorney would later determine that the encounter was consensual and not to charge Doe. [3]

Roe's mother called Gibson the day after the incident and told her that Roe was sexually assaulted and that she intended to press charges. According to Roe's mother, Gibson did not ask any questions, did not indicate that she would investigate, and never provided a written report of any findings.

Gibson did not interview Roe, and the parties dispute whether Gibson took Roe's written statement. The District also says that Gibson and assistant principal Rashad Godbolt interviewed Doe and took his written statement, but the District has not produced any documentation of any interview or statement. After viewing the footage and taking statements, Gibson says that she decided, "probably pretty early on," that it was a consensual sexual encounter that went "too far." Based on this and her professed belief that if she punished Doe she would have to punish Roe as well, Gibson decided not to discipline Doe. Even so, Gibson says that she

---

[3] An entry in a Sheriff's Office "case supplemental report" describes the District Attorney's decision not to charge Doe. According to Sergeant Ruth J. Weast, the District Attorney decided not to charge Doe "[b]ecause the act was consensual between the complainant and suspect, and the fact that the affirmative defense to prosecution applies in this case, criminal charges were not accepted. The suspect did not use duress[,] coercion[,] or threats. The suspect is not a registered sex offender and the sexual acts were consensual and the age difference is not more than 3 years."

met with Doe and his mother, though possibly at different times, and instructed him to stay away from Roe.

Gibson admits that her communication with campus police and other law enforcement was sparse. Despite not recalling the exact timeline, she concedes that she did not speak to campus police until a few weeks after the incident, at which point they told her that the Sheriff's Office was investigating. Gibson never obtained a police report from campus police. And while she claims that Roe's mother gave her a copy of the Sheriff's report, Roe disputes that the District ever obtained any records from the Sheriff's Office—according to her, it was she who subpoenaed and produced the records during discovery. Although Gibson testified that she was open to changing her mind based on the outcome of the Sheriff's investigation, she did not follow up with the Sheriff and admits that she made her decision without significant input from law enforcement.

Roe did not return to school for the rest of the 2013–2014 school year. Instead, she began taking homebound classes. District employees delivered coursework to her home but did not give her any instruction. Roe's mother asked one of the Cypress Creek counselors about counseling and the counselor responded that the school "does not do that."[4] Roe failed multiple classes that semester.

Roe returned to Cypress Creek for the 2014–2015 school year. She saw Doe frequently at school and spoke to him once. After Doe exchanged choice words with Roe's mother and her mother's boyfriend at the grocery store, Roe called Doe a "b****" at school, to which—according to Roe—

---

[4] Roe's counselor remembers having a conversation with Roe about her academic performance prior to taking "homebound" status, but does not recall any allegation of sexual assault, any conversation with Roe's mother, or even that Roe was dating anyone.

Doe responded, "I've got a something coming for y'all, a tool," referencing a gun. Roe reported the threat to assistant principal Godbolt, who told her to "leave [Doe] alone and not talk to him." Godbolt also called Doe into the office to speak with him.

Other classmates harassed Roe as well. Doe's friends bullied her in person and on social media. In person, a group of girls confronted Roe in a school bathroom and accused her of trying to get Doe arrested by falsely accusing him of rape. And on social media, classmates called her a "baby killer," "scum," "a horrible human being," tagged her in a picture of a dead fetus, and told her to kill herself. The harassment had a large impact on Roe, and she attempted suicide by intentionally overdosing on Benadryl in June of 2015.

Roe survived the overdose and decided to transfer to a school near her father's house in Indiana. But in March of 2016, she—missing the rest of her family—decided to move back and re-enroll for the remainder of the 2015–2016 school year. Roe's mother repeatedly discussed her re-enrollment with a Cypress Creek counselor. She again asked the school to reschedule Roe's classes to avoid contact with Doe. The counselor responded that she would do what she could but that nothing could be done about the past. School personnel refused to provide any reassurances or resources to help Roe as she confronted returning to the school where she had been abused, controlled, and assaulted by Doe, and bullied and attacked by other students on account of the assault and her pregnancy. Nothing was done, and Roe soon became overwhelmed. Eventually, someone in the registrar's office encouraged Roe's mother to withdraw Roe and homeschool her to avoid truancy charges. Roe did withdraw from Cypress Creek and never returned—to it or any other school.

Roe sued the District, bringing claims under Title IX among other things. The district court granted the District's motion to dismiss the § 1983 claim. Roe alleged that the District: (1) had Title IX policies and practices that created a "heightened risk" that she would be assaulted; (2) was deliberately indifferent to the warning signs of her assault; and (3) was deliberately indifferent in response to her abusive relationship, sexual assault, and subsequent related harassment. The district court granted the District's motion for summary judgment on the Title IX claim.

Roe appeals that order. She argues here that the District was deliberately indifferent both to (i) her risk of sexual assault and (ii) in response to her abusive relationship, sexual assault, and subsequent related harassment.

## II.

We review a district court's grant of summary judgment *de novo*. *Green v. Life Ins. Co. of North Am.*, 754 F.3d 324, 329 (5th Cir. 2014). Summary judgment is appropriate only when there is no genuine dispute of any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "The sole question is whether a 'reasonable jury drawing all inferences in favor of the nonmoving party could arrive at a verdict in that party's favor.'" *Guzman v. Allstate Assurance Co.*, 18 F.4th 157, 160 (5th Cir. 2021) (quoting *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991)).

## III.

"Congress enacted Title IX in 1972 with two principal objectives in mind: '[T]o avoid the use of federal resources to support discriminatory practices' and 'to provide individual citizens effective protection against those practices.'" *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286

(1998) (alteration in original) (quoting *Cannon v. Univ. of Chicago*, 441 U.S. 677, 704 (1979)).  In line with those objectives, Title IX states:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a).

Title IX includes a private right of action. *Id.*, *see e.g.*, *Cannon*, 441 U.S. at 694–98.  Through it, school districts may be liable for, among other things, student-on-student sexual harassment if: (1) the District had actual knowledge of the harassment; (2) the harasser was under the District's control; (3) the harassment was based on the victim's sex; (4) the harassment was "so severe, pervasive, and objectively offensive that it effectively bar[red] the victim's access to an educational opportunity or benefit"; and (5) the District was deliberately indifferent to the harassment.  *Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 165 (5th Cir. 2011) (alteration in original) (quoting *Davis ex rel. Lashonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999)).

Two elements are at issue here: the first and the fifth. The first element, actual knowledge, means that the school must have actual, not constructive, knowledge of sexual harassment.  *Davis*, 526 U.S. at 650; *K.S. v. Nw. Indep. Sch. Dist.*, 689 F. App'x 780, 784 (5th Cir. 2017).  Specifically, the school must have actual knowledge that harassment has occurred, is occurring, or that there is a "substantial risk that sexual abuse would occur." *M.E. v. Alvin Indep. Sch. Dist.*, 840 F. App'x 773, 775 (5th Cir. 2020) (quoting *Rosa H. v. San Elizario Indep. Sch. Dist.*, 106 F.3d 648, 652–53 (5th Cir. 1997)).  Accordingly, liability requires that "the official must both be aware of facts from which the inference could be drawn that a substantial risk of

No. 20-20657

serious harm exists, and he must also draw the inference." *Rosa H.*, 106 F.3d at 659 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).

The fifth element, deliberate indifference, is also a high bar. Deliberate indifference requires the District's response to be "clearly unreasonable in light of the known circumstances." *Sanches*, 647 F.3d at 167 (quoting *Davis*, 526 U.S. at 648). This is more than negligence. Courts afford broad deference to school officials and should not "second-guess[] the disciplinary decisions made by school administrators." *Davis*, 526 U.S. at 648. Schools need not "accede to a parent's remedial demands" or actually succeed in remedying the harassment. *Sanches*, 647 F.3d at 167–68. However, when there is "an official decision by the [school district] not to remedy the violation" such that its deliberate indifference "caus[es] the discrimination," a school commits a Title IX violation. *Gebser*, 524 U.S. at 290–91; *Davis*, 526 U.S. at 642–43.

A.

First, we consider whether the district court properly concluded that the District was not deliberately indifferent to Roe's risk of sexual assault. Roe offers two arguments for the District's deliberate indifference to the risk of her sexual assault. While genuinely disturbing, neither shows actual knowledge of Roe's risk of sexual assault.

Roe first argues that the district's Title IX policies and practices were so deficient that the District was deliberately indifferent to the risk of her sexual assault. She contends that the District failed to adequately train its employees about Title IX and its own sexual harassment and dating policies. She further claims that the District engaged in "disciplinary and record-keeping and reporting practices" designed to conceal incidents of sexual assault and harassment.

Relatedly, Roe also argues that the District was deliberately indifferent to the known risk of dating violence and sexual assault at Cypress Creek. She provides evidence that Cypress Creek had a history of student sexual conduct in stairwells. She also compiles employees' recollections of dating violence and other sexual misconduct on campus. Roe contends that the District was deliberately indifferent to these past incidents of sexual misconduct, which form the background for her sexual assault.

However, these theories do not suffice under our circuit's binding case law. Even if Roe is correct that the District failed to appropriately implement its Title IX obligations, she does not connect this failure to the District's knowledge about her in particular. *See, e.g.*, *Sanches*, 647 F.3d at 169. Furthermore, the District's response to other incidents of sexual harassment do not show the District's knowledge of a substantial risk of *Roe's* sexual assault. We have not defined precisely whether and to what extent the harassment of persons "other than the plaintiff" may constitute actual knowledge of the plaintiff's specific risk of Title IX harm. *Doe v. Edgewood Indep. Sch. Dist.*, 964 F.3d 351, 363 (5th Cir. 2020). Nonetheless, assorted incidents of sexual misconduct involving neither the Title IX victim nor the aggressor are generally insufficient to give a school district actual knowledge of the plaintiff's assault. At most, these arguments show only "constructive notice by another name." *Id.* at 364.

For these reasons, Roe is unable to create a genuine issue of material fact about whether the District is liable for pre-assault deliberate indifference.

## B.

We next consider if the district court erred in finding that the District was not deliberately indifferent in response to Roe's abusive relationship, sexual assault, and subsequent related harassment. The totality of the circumstances, including the District's lack of investigation, awareness of the

pre-assault abusive relationship, failure to prevent in-person and cyber-attacks from Doe and other students post-assault, and failure to provide any academic or other appropriate support to Roe, culminated in exactly what Title IX is designed to prevent—the tragedy of Roe dropping out of school. A reasonable jury could find that the District violated Title IX based on these facts.

i.

To be actionable under Title IX, harassment must be "so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit." *Sanches*, 647 F.3d at 165 (5th Cir. 2011) (alteration in original) (quoting *Davis*, 526 U.S. at 650). There is a circuit split regarding whether a "single instance of sufficiently severe one-on-one peer harassment" could ever rise to the level of "pervasive" harassment. *Davis,* at 652–53. Three circuits have held that "pervasive" student-on-student harassment for Title IX purposes "means *multiple* incidents of harassment; one incident of harassment is not enough." *Kollaritsch v. Mich. State Univ. Bd. of Trustees*, 944 F.3d 613, 620 (6th Cir. 2019), *see K.T. v. Culver-Stockton Coll.*, 865 F.3d 1054, 1058 (8th Cir. 2017); *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736, 740 (9th Cir. 2000). On the other side of the split, four circuits have held that students must demonstrate only that a school's deliberate indifference made harassment more likely, not that it actually led to any additional post-notice incidences of harassment. *Doe v. Fairfax Cnty. Sch. Bd.*, 1 F.4th 257, 274 (4th Cir. 2021); *Farmer v. Kansas State Univ.*, 918 F.3d 1094, 1108 (10th Cir. 2019); *Fitzgerald v. Barnstable Sch. Comm.*, 504 F.3d 165, 172 (1st Cir. 2007), *reversed and remanded on other grounds*, 555 U.S. 246 (2009); *Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1295–97 (11th Cir. 2007)).

Our Circuit has not yet opined on what constitutes "pervasive" harassment, and the District did not raise this issue in its brief nor did the district court consider it. Even though no party contests this point, we hold that, based on these unique circumstances, a reasonable jury could conclude that the harassment Roe experienced was pervasive was no matter on which side of the circuit split we fall.

Roe suffered a years-long abusive relationship that culminated in a brutal sexual assault. Her sexual assault lead directly to further harassment and bullying by her peers. This is far more than a "single instance of . . . harassment." *Davis,* at 652–53. Although Roe's abusive relationship *on its own* was not sufficient to show the District's deliberate indifference towards her risk of sexual assault, when combined with the sexual assault and subsequent harassment, the totality of the circumstances shows "severe, pervasive, and objectively offensive" harassment that resulted in Roe dropping out of school—a clear bar to an "educational opportunity or benefit." *Sanches*, 647 F.3d at 165 (5th Cir. 2011) (alteration in original) (quoting *Davis*, 526 U.S. at 650).

There is no need for Roe to show that her post-assault harassment and bullying was on its own "severe, pervasive, and objectively offensive," although a reasonable jury could find that it met that standard. Roe was accosted and accused of trying to get Doe arrested by falsely accusing him of rape, called "scum," "a horrible human being," and a "baby killer;" tagged in pictures of dead fetuses, told her to kill herself, and threatened by Doe with his "tool" comment. She was harassed to the point of attempted suicide. This harassment was not the mere "insults, banter, teasing, shoving, pushing, and gender-specific conduct" that the Supreme Court has held to

No. 20-20657

fall short of Title IX standards, *Sanches*, 647 F.3d at 167 (quotation omitted), especially in the wake of a violent sexual assault and abusive relationship.[5]

ii.

We next consider if the district court erred in finding that the District was not deliberately indifferent in response to Roe's abusive relationship, sexual assault, and subsequent related harassment.

Roe alleges numerous factual and procedural errors in the District's response to her years-long abusive relationship, sexual assault, and subsequent related harassment and bullying. According to her, Gibson—the assistant principal tasked, along with assistant principal Godbolt, with investigating Roe's assault[6]—did not interview her or even take her written statement. Gibson never saw the campus police's initial report and never saw Roe's hospital records. The District did not investigate at all after turning its records over to the Sheriff's Office. Gibson spoke to campus police for the first—and only—time "a few weeks" after the incident occurred, never spoke to the Sheriff's Office, and never received a report on its investigation. No effort was made at any point to ensure that Doe and Roe

---

[5] The District also mentions in passing that it lacked control over at least some of Roe's post-deliberate-indifference harassment and that her post-deliberate-indifference harassment was not based on sex. The District forfeits these arguments by failing to adequately brief them both in district court and on appeal. *United States v. Scroggins*, 599 F.3d 433, 449 (5th Cir. 2010); (mentioning control twice only in passing, and not mentioning whether the post-deliberate-indifference harassment was harassment based on sex); (not mentioning control or harassment based on sex); (mentioning control twice only in passing, and mentioning harassment based on sex once). Similarly, the District forfeits any argument that Roe *must* show that it had control over her post-deliberate-indifference harassment. In any event, Roe has presented competent summary judgment evidence that her post-deliberate-indifference harassment occurred at least in part during the school year.

[6] Gibson testified in her deposition that she was the District's designee in this case. The District does not dispute that Gibson was its representative in its purported investigation.

14

did not share classes or lunch or to protect Roe from the bullying and attacks from other students.   Furthermore, the District did not provide her with any instruction while she took homebound courses and gave her neither academic nor other appropriate support in the wake of her sexual assault, abusive relationship, and resulting harassment and bullying.   Instead, Roe says that someone in the registrar's office encouraged her to drop out of school to avoid truancy charges, which she ultimately did.   These unique circumstances are sufficient to raise a fact issue as to deliberate indifference

The District sees things differently.   According to it, Gibson and Godbolt promptly viewed the available video footage from the school hallway, which showed only Roe and Doe walking in the hallway after school had dismissed and before Roe attended her tutorial.   Gibson initially claimed to have viewed video footage from the hallway before and after the assault as well, but the District now admits that no such video footage exists.[7]   Gibson took written statements from both Roe and Doe.[8]   Gibson and Godbolt interviewed Doe, notified his parents, and instructed Doe to have no further contact with Roe.   Based on this information, Gibson determined that Roe had been injured during a consensual sexual encounter that went "too far."   After "multiple conversations" with other administrators, she then declined to punish Doe, believing that if she punished Doe for consensual sexual activity, she would have to punish Roe as well.   Gibson admits that she first spoke to campus police "a few weeks" after the incident, at which point she

---

[7] This also conflicts with Godbolt's testimony that the only video they were able to locate was when the bell rang at dismissal.

[8] In the District's objections and answers to Roe's interrogatories, it says that Gibson also interviewed Roe when "Roe and her mother came up to the school to talk with her."   But Gibson did not recall meeting with Roe.   And while Gibson testified in her deposition that Roe wrote a statement, she did not believe that Roe either wrote the statement in her presence or returned the statement personally to her.

learned that the Sheriff's Office was investigating, but she says she was open to changing her mind based on the results of its investigation. When she received the result of the Sheriff's investigation from Roe's mother, its consensual-conduct conclusion confirmed her own.

Gibson also claims to have thoroughly documented the investigation in accordance with district policy, but the District admits that it cannot produce any of the documentation due to its document retention schedule. This is a generous recounting of the District's account. It is unclear whether the District even claims to have—through Gibson or any other district employee—received *any* documents about the Sheriff's investigation or conclusion, any update from the Sheriff's Office about the result of its investigation, or any word from the Harris County District Attorney's Office about its decision not to charge Doe. While Gibson testified in her deposition that she received the Sheriff's police report from Roe's mother, it is unclear whether she was referring to the Sheriff's final report or some other document. For its part, the District appears to state only that "Gibson testified that she asked Roe's mother for information regarding the incident."

We conclude that a reasonable jury could conclude that the District was deliberately indifferent. Viewing the facts in the light most favorable to Roe, a reasonable jury could conclude—at least—that Gibson never interviewed Roe or took her written statement; never interviewed Doe or took his written statement; spoke to campus police only once weeks after the assault, when campus police notified her that the Sheriff's Office was taking over; never saw a copy of the campus police report; never saw a copy of the Sheriff's police report or spoke to the Sheriff's Office about the status or findings of its investigation; and did not conduct any further investigation of the incident after learning that the matter was referred to the Sheriff's Office.

No. 20-20657

These particular circumstances are sufficient to support indifference at this stage.

Furthermore, and even more fundamentally, the District has been able to produce virtually no documentation of its alleged investigation. Though perhaps understandable, this failure turns much of this case into a she-said, she-said dispute. She-said, she-said disputes are quintessentially questions for juries, well within not only the jury's bailiwick but also its exclusive jurisdiction. Here, a reasonable jury could simply disbelieve the District's side of the story. For instance, Gibson and Godbolt claim that they interviewed Doe and took his written statement in the wake of Roe's assault. Putting aside the fact that the District's interrogatory answers, Gibson's deposition, and Godbolt's deposition all vary significantly—both in amount of recall and in substance—the District has not produced any documentation of Doe's interview or written statement.

As a result, a jury may simply not believe that the District ever interviewed Doe or took his written statement. On summary judgment, we may not presume that the jury will find Gibson or Godbolt credible. The District fails to carry its summary judgment burden where a reasonable jury may just as easily disbelieve its account. *Deville v. Marcantel*, 567 F.3d 156, 165 (5th Cir. 2009) ("Summary judgment is not appropriate when 'questions about the credibility of key witnesses loom . . . large' and the evidence could permit the trier-of-fact to treat their testimony with 'skeptical scrutiny.'" (quoting *Thomas v. Great Atl. & Pac. Tea Co.*, 233 F.3d 326, 331 (5th Cir. 2000))). And if Roe's account is true—as a jury is entitled to believe—the District's response to a years-long abusive relationship, sexual assault on school property that resulted in the victim's hospitalization and two

17

surgeries, and subsequent related harassment and bullying was insufficient enough to show deliberate indifference.[9]

Our precedents bolster this conclusion. On the undisputed facts alone, the District's response pales in comparison to the prior investigations that we have held to be sufficient under Title IX. In *Sanches*, the school district responded promptly to each report of verbal harassment; interviewed many of the parties involved, including the accuser, accused, other students, and teachers; and compiled a formal report detailing the District's "investigations of and responses to" five allegations of verbal harassment. 647 F.3d at 160–63.

In *I.F. v. Lewisville Independent School District*, the District responded to a report of rape and subsequent harassment by interviewing fourteen students, taking the accuser's written statement, "work[ing] together with I.F.'s teachers to get her the work she was missing during her absence[,] request[ing] the teachers be flexible with I.F.'s workload, provid[ing] her with information regarding educational opportunities outside of [the school district], and assist[ing] I.F. in enrolling in the Homebound program." 915 F.3d 360, 377 (5th Cir. 2019).

And in *K.S.*, the school district reprimanded some of the students involved (in some cases with suspension), had staff monitor and escort the victim at school, and required the victim to sit behind the bus driver to avoid

---

[9] A jury might also consider the fact that neither of Roe's two high-school counselors recall being told about her assault. Similarly, it might consider that Roe's teacher accused her of, in Roe's words, failing English because she "dropped out of school."

altercations.  689 F. App'x at 784–85.  The list goes on.[10]  This case bears no resemblance to these.

The District looks for support in *I.L. v. Houston Independent School District*, but that case does not contradict our holding here.  There, we stated that "in 'a situation where there is some indication that the incident may have been consensual, and where there is the potential for criminal charges if it was an assault, it is not "clearly unreasonable" to rely on the investigative expertise of a law enforcement agency.'"  776 F. App'x 839, 843–44 (5th Cir. 2019) (quoting the district court's order). In *Sanches*, the administrator also "relied on law enforcement's investigations [and periodic reports] of the incident." 647 F.3d 156, 170 (5th Cir. 2011). But while a school district may rely on a law-enforcement *investigation* in some circumstances, it may not rely merely on a prosecutor's decision not to accept charges.[11] *See  Stinson ex rel.*

---

[10] *Estate of Lance v. Lewisville Indep. Sch. Dist.*, 743 F.3d 982, 997–99 (5th Cir. 2014) (responding to a pattern of harassment by repeatedly interviewing students and contacting their parents, working to repair students' relationships, monitoring harassment and following up with students, and enforcing separation); *Ruvalcaba*, No. 20-40491, 2022 WL 340592, at *5 (responding to a single incident of sexual assault by immediately taking the victim's written statement; escorting the victim to the campus police's office; contacting the mother; directing the alleged aggressor not to come to school; sending the principal and a campus police officer to speak with the victim at the police station; interviewing the victim, alleged aggressor, and others who interacted with them throughout the day; involving the district's Title IX coordinator; and conducting a lie-detector test and a "several-months-long investigation").

[11] The investigation in *I.L.* was also much more comprehensive than that which a jury could find here.  The school responded to the victim's sexual assault by immediately taking the victim's written statement, calling both students' parents, and questioning the accused student until campus police took over the interview.  *I.L.*, 776 F. App'x at 840. After reviewing text messages and security video, the school then entered a strict, supervised no-contact order between the victim and her aggressor pending the conclusion of the campus police's investigation.  *Id.* at 840–41.  The student suffered no further sexual harassment and "[t]he school otherwise tried to support [the victim] in several ways."  *Id.* at 840.  An assistant principal made herself available to I.L. to talk at any time and "worked

*K.R. v. Maye*, 824 F. App'x 849, 858–59 (11th Cir. 2020) (rejecting purported reliance on a law enforcement investigation where (on appeal of the complaint's dismissal), the complaint (1) "allege[d] that [the official] only made a phone call to police that allegedly led to their conclusion that something happened to K.R. that should be deemed 'consensual sex,'" and (2) alleged that the official "made no investigation himself and apparently . . . did not inquire as to what investigation was done by the police"); *Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist.*, 511 F.3d 1114, 1121 (10th Cir. 2008) ("The district's response was not clearly unreasonable as school officials immediately contacted law enforcement officials, cooperated fully in the investigation, *and kept informed of the investigation*." (emphasis added)). And here, there is a fact issue regarding whether Gibson ever even looked at the investigation. It is impossible to rely on an investigation of which one is not aware. Different legal standards apply to criminal prosecutions and educational discipline, and Title IX requires more than parroting a prosecutorial decision. Because there are genuine issues of material fact about whether Gibson (or any other district administrator) saw any police report or had any substantive communications with law enforcement, a reasonable jury may conclude that the district relied merely on a prosecutorial decision not to press charges, not on investigative expertise. Title IX requires more.[12]

---

with [the victim's] parents to address her academic and attendance problems." *Id.* Under these circumstances, it was not clearly unreasonable to defer final disciplinary action pending further findings from a law enforcement investigation.

[12] Several of our Sister Circuits have reached similar conclusions. *See also Stinson ex rel. K.R. v. Maye*, 824 F. App'x 849, 858–59 (11th Cir. 2020) (rejecting purported reliance on a law enforcement investigation where (on appeal of the complaint's dismissal), the complaint (1) "allege[d] that [the official] only made a phone call to police that allegedly led to their conclusion that something happened to K.R. that should be deemed 'consensual

No. 20-20657

Turning to precedent from other Circuits is also instructive. In *Doe v. East Haven Board of Education*, 200 F. App'x 46, 49 (2d Cir. 2006), the Second Circuit upheld a jury verdict for the plaintiff, finding that a "reasonable fact-finder could conclude that school authorities were deliberately indifferent to the harassment [following a student's rape] [even when the plaintiff] was allowed to miss class and work in the guidance office, was offered a private room in the guidance office when she felt uncomfortable with other students there, was offered full home-bound instruction or a security guard to accompany her whenever she was in school, and was offered free psychological counseling and evaluation. Furthermore, approximately five weeks after [plaintiff] reported the rape, whenever [plaintiff] made a specific claim of name-calling, school authorities would call in the accused students and their parents for meetings, at which [school] police officers were sometimes present to emphasize that such behavior had to stop . . . [W]here the alleged victim of a rape complained of verbal harassment based on her sex and related to the rape for five weeks before authorities took concrete action to get the perpetrators of the harassment to stop." *Doe v. E. Haven Bd. of Educ.*, 200 F. App'x 46, 49 (2d Cir. 2006). The District here did much less than this in response to Roe's abusive relationship, sexual assault, and subsequent related harassment and bullying.

\* \* \*

Roe says that her school did not investigate her sexual assault and gave her neither academic nor other appropriate support in the wake of her sexual

---

sex,'" and (2) alleged that the official "made no investigation himself and apparently . . . did not inquire as to what investigation was done by the police"); *Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist.*, 511 F.3d 1114, 1121 (10th Cir. 2008) ("The district's response was not clearly unreasonable as school officials immediately contacted law enforcement officials, cooperated fully in the investigation, *and kept informed of the investigation.*" (emphasis added)).

No. 20-20657

assault, abusive relationship, and resulting harassment and bullying. Her school district says it did all that Title IX requires. Either way, a jury should decide based on the unique record before us. Because the jury may believe Roe and find in her favor, the district court's grant of summary judgment is REVERSED as to whether the District was deliberately indifferent in response to the totality of the harassment at issue here. The district court's decision is AFFIRMED as to whether the District was deliberately indifferent to the risk of her sexual assault. AFFIRMED IN PART, REVERSED IN PART.