# United States Court of Appeals for the Fifth Circuit

No. 23-10773

United States Court of Appeals
Fifth Circuit

**FILED**

December 16, 2024

Lyle W. Cayce
Clerk

J. T., *Individually and as next friend of* M. L. *a minor*,

*Plaintiff—Appellant*,

*versus*

Uplift Education,

*Defendant—Appellee*.

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:20-CV-3443

Before Southwick, Haynes, and Douglas, *Circuit Judges*.
Per Curiam:*

This case requires us to determine whether Defendant-Appellee, Uplift Education, is liable under Title IX and 42 U.S.C. § 1983 for the tragic abuse suffered by a Kindergartener at the hands of an Uplift employee. Because Title IX and § 1983 contain significant hurdles for the imputation of liability in this instance, we find that J.T.'s claims cannot survive summary judgment. We accordingly AFFIRM the ruling of the district court.

---

* This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

No. 23-10773

I

Early in his teaching career, Jamil Wazed applied to work as an elementary educator at Grand Primary Preparatory, a Texas K-5 charter school operated by the non-profit entity, Uplift Education. Wazed was screened, interviewed, and hired shortly thereafter. At first, the school's hiring decision seemed like a wise one: Wazed was popular with students, received positive feedback from parents, and earned encouraging performance reviews from the school. His success in the classroom made him one of the school's most popular teachers, convincing administrators to honor him with a faculty leadership position.

Three years into Wazed's tenure, however, things took a disturbing turn. Days before the start of a new school year, the school administration received an email from a concerned parent, recounting an exchange she had with her daughter. According to the email, the daughter said that, in the year prior, Wazed "kiss[ed] her on her neck and that his beard tickled her neck." In response to the report, the school administration immediately placed Wazed on leave, forbidding him from interacting with students or entering school property without invitation and supervision.

The school then launched an investigation. It began by interviewing the parent and female student central to the email. The student confirmed that Wazed had kissed her on the neck and further explained that Wazed would cuddle with students during story time. The school then interviewed four more students, with multiple confirming Wazed's classroom behavior. Two offered additional details. One said that Wazed "kissed" her "on the forehead like when you kiss your brain"; another said Wazed only ever "hugged her." The only male student interviewed offered a different experience: He denied that Wazed had ever kissed him at all. Despite the differing reports, the students all conveyed their satisfaction with Wazed,

with some calling him "their favorite teacher," and expressing how much they "missed" having him as their instructor.

M.L. was among those interviewed. During the investigation, the administration questioned her the same way it did the other students. Like many of her female peers, M.L. responded that Wazed kissed her, but as "a reward" when she was "good." Also like the others, she expressed her fondness of Wazed, stating that he was her "favorite teacher."

The administration next asked Wazed for a statement. Writing by hand, he denied the allegations, stating that he "never kissed a scholar." The school then closed the investigation. The director compiled all her findings in a report that credited the students' accounts over Wazed's. She further concluded that Wazed had acted inappropriately when he kissed at least three female students. But, in the director's view, the conduct was not malicious. She accordingly recommended that Wazed receive a disciplinary warning and be allowed to return after meeting with school leadership. The proposed meeting would stress "the expectations regarding student and staff physical space and touch." The director sent her findings and recommendation to Uplift Education for approval.

Uplift rejected the recommendation based on its zero-tolerance for any "inappropriate physical contact between educators and students." To this end, Uplift directed Grand Primary to revise its report, get a more detailed statement from Wazed, and prepare to terminate his employment. Grand Primary did as Uplift directed. Days later, Uplift reported Wazed's termination and conduct to the State Board for Educator Certification and the Child Protective Services. Incorrectly, throughout the ordeal, the school never discussed Wazed's alleged conduct, the investigation, or his termination with M.L.'s mother, J.T.

No. 23-10773

Sadly, the extent of Wazed's abuse was far worse than anyone knew. At least for Uplift, the full scope of the misconduct would not become clear until almost one year later when J.T. contacted Grand Primary. By phone, she informed the school about "something" that happened between Wazed and her daughter. The call was short on details, but she relayed that she contacted police to report the unidentified incident.

Uplift's next update came from the Police Department. Authorities explained that they charged Wazed with sexually assaulting multiple Kindergarten students, including M.L. Even worse, Wazed offered the tragic details about how and when his abuse took place. According to his account, Wazed assaulted his victims several times throughout the school year in an open classroom. To facilitate the abuse, Wazed played movies to his class in low lighting, while separating himself and his victims behind a "wall" of privacy folders situated on his desktop. Concealed from the other pre-occupied students, Wazed would demand his victims perform oral sex. Wazed never denied the criminal charges. To the contrary, he pled guilty to one count of aggravated sexual assault of a child and was sentenced to seven years in prison.

J.T. filed this lawsuit, bringing claims against Uplift under Title IX and 42 U.S.C. § 1983. According to J.T., Uplift is liable for Wazed's sexual abuse and its allegedly inadequate response to the email that first flagged Wazed's misconduct. She also alleges Uplift failed to implement policies that would have prevented the abuse. Uplift moved for summary judgment on those claims, arguing that J.T. lacked evidence that could create a factual dispute. The district court agreed and awarded summary judgment in Uplift's favor.

Believing that holding to be in error, J.T. challenges the district court's ruling on appeal. She contends that the district court minimized

4

"abundant evidence" supporting her liability theories and asks this panel to reverse the district court's ruling and remand for further proceedings.

## II

This court reviews a summary judgment ruling de novo, "viewing all evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor." *Est. of Lance v. Lewisville Indep. Sch. Dist.*, 743 F.3d 982, 989 (5th Cir. 2014) (quoting *Pierce v. Dep't of the U.S. Air Force*, 512 F.3d 184, 186 (5th Cir. 2007)). Summary judgment is appropriate only when the movant shows that there exists "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## III

As noted above, J.T. attempts to hold Uplift accountable for Wazed's abuse, citing two sources of law. We first consider her Title IX theories, and then turn to her claims arising under § 1983.

## A

Title IX prohibits discrimination "on the basis of sex . . . under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Among the "program[s] or activit[ies]" within the statute's ambit are public schools supported with federal dollars. *See id.* § 1687. When such schools violate Title IX's provisions, the only remedy the statute offers, by its terms, is eliminating the public entity's funding. *Id.* § 1682. The Supreme Court has nevertheless held that an implied right of action for suits for damages exists. *Cannon v. Univ. of Chi.*, 441 U.S. 677, 717 (1979). By extension, plaintiffs may bring a suit for damages based on the discriminatory actions of a school employee. *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 277 (1998).

No. 23-10773

Here, J.T. attempts to do just that, contending that Uplift is liable under Title IX for the sexual assault perpetrated by Wazed. Recovering under such a theory, however, requires that J.T. clear a daunting hurdle: She must prove that "an official of the [defendant educational institution] who at a minimum has authority to institute corrective measures . . . has actual notice of, and is deliberately indifferent to, the teacher's misconduct." *Id.*

The crux of this Title IX case is whether J.T. offers evidence that could conceivably meet that standard.[1] To make her case, she bifurcates her arguments between two time periods. The dividing line rests on the moment Uplift received the email reporting that Wazed kissed a student. During both periods (pre- and post-email), J.T. contends Uplift had actual knowledge of Wazed's abuse.

1

We first consider what Uplift knew before the email. Citing two theories of actual knowledge, J.T. argues that Uplift was aware of Wazed's sexual misconduct. She first contends that another school employee witnessed the abuse and may have reported it to the school's administration. For support, J.T. points to M.L.'s deposition where she recounted a teaching aid walking into Wazed's classroom while Wazed was abusing her. In M.L.'s words, the aid "noticed" what was happening, but "didn't care." When asked about this alleged encounter, the aid denied she had ever witnessed anything inappropriate. If she had, the aid explained, she would "have immediately intervened" and "reported" Wazed "to a Grand Primary administrator."

---

[1] As a threshold matter, no one disputes whether Uplift qualifies as a Title IX institution, nor does any party contest whether Wazed's young victim suffered severe and pervasive sexual abuse actionable under Title IX.

Though these competing stories raise questions about whether the aid witnessed the abuse, the dueling testimony does not create an actual knowledge dispute under Title IX. Even if the aid witnessed Wazed victimize his students, her knowledge does not impute to the school. Only when an appropriate person possesses actual knowledge can a Title IX recipient be liable. *Rosa H. v. San Elizario Indep. Sch. Dist.*, 106 F.3d 648, 660 (5th Cir. 1997). The "appropriate person" designation is reserved for only those officials with the power to "institute corrective measures." *Gebser*, 524 U.S. at 277. The aid here had no such authority. And the same is true for the "bulk" of school employees, like the aid's "fellow teachers, coaches, and janitors." *Rosa H.*, 106 F.3d at 660.

The reason for maintaining the distinction between "appropriate persons" and everyone else is straightforward: "When [a] school board [accepts] federal funds, it agree[s] not to discriminate on the basis of sex"; it does not agree to incur "liability whenever its employees discriminate on the basis of sex." *Id.* at 654. Title IX recipients, in other words, "are liable only for [their] *intentional* sex discrimination," *Doe v. Edgewood Indep. Sch. Dist.*, 964 F.3d 351, 358 (5th Cir. 2020), not the discrimination of their subordinates. This means that J.T. must show actual knowledge of those whose "practical control are sufficiently close to reflect" the school's "intentional discrimination." *Rosa H.*, 106 F.3d at 660; *see Gebser*, 524 U.S. at 288.

J.T. does not dispute that well-established principle. Nor does she assert that the aid herself was an "appropriate person" under Title IX caselaw. She instead attempts to skirt the actual knowledge inquiry, citing two additional points. First, she reiterates that the teaching aid testified she would have reported the abuse to Uplift's administration had she witnessed the incident. Second, she stresses that Texas law imposes an affirmative obligation on teachers to report the sexual misconduct that they witness. *See*

Tᴇx. Fᴀᴍ. Cᴏᴅᴇ §§ 261.101(a)–(b), 261.102, 261.103(a) & (c). Both facts, she contends, could allow a jury to infer that the aid not only saw the abuse, but subsequently reported it to an "appropriate person." Said another way, if the aid's actual knowledge is in dispute, so too is whether the aid reported what she observed.

Unfortunately, however, this argument fails to recognize that "[a]nyone can make reports." *Rosa H.*, 106 F.3d at 661. And simply because an employee would, could, or should report misconduct does not mean misconduct was known to an "appropriate person," under the law. *Edgewood Indep. Sch. Dist.*, 964 F.3d at 364. Any view otherwise would allow the Title IX analysis to cover any school employee authorized "to halt" or report abuse. *Id.* at 361. This court recently affirmed that fact in *Doe v. Edgewood Independent School District*. *Id.* at 364. There, although the peace officer could and should have "enforce[d] the law," he lacked authority to discipline the abuser, "repudiate th[e] conduct[,] and eliminate the hostile environment." *Id.* at 360. Despite having unique tools to address misconduct—such as taking an abuser into custody—he was not considered an "appropriate person" under Title IX. *Id.* So too here. What the aid would or should have done in a situation that she denied ever happened does not evince actual knowledge by an appropriate Uplift official. That she was charged by law or her own moral compass to report such abuse does not change that reality. *See id.* at 364. Without evidence showing the aid provided a report to the school's administration, or any evidence about whether the administration received such a report, we agree with the district court that summary judgment was appropriate as to this claim.

Separate from what the teaching aid allegedly witnessed, J.T. also asserts that Uplift knew of Wazed's abuse by other means. In her telling, other Uplift employees "notice[d]" the classroom conditions that facilitated Wazed's misconduct. According to J.T.'s expert, darkened rooms and the

peculiar use of privacy folders in this context were both "red flags" that pointed to sexual abuse—"red flags," she urges, that could not have gone unnoticed. Any passerby would see these features through a two-foot window located on Wazed's classroom door. Wazed later confirmed this fact, testifying that his dark room and folders were directly visible from the hallway. Making matters worse, the academic director's office was only a few doors down, around one hundred feet from Wazed's classroom. Given the director's proximity and the visibility of obvious "red flags," J.T. alleges that an "appropriate person" knew that M.L. faced a substantial likelihood of sexual abuse.

We disagree. True enough, a plaintiff can prevail under Title IX "by establishing that the school district failed to act even though it knew that [an employee] posed a *substantial risk* of harassing students in general." *Rosa H.*, 106 F.3d at 659 (emphasis added). Yet, "[v]ague allegations that do not include sexual harassment do not put a school district on notice of that risk." *Doe v. Katy Indep. Sch. Dist.*, 427 F. Supp. 3d 870, 880 (S.D. Tex. 2019). Nor can plaintiffs circumvent Title IX's exacting standards by pointing to an official's constructive knowledge of "red flags." This court recently held as much in a recent unpublished case, *M.E. v. Alvin Independent School District.* 840 F. App'x 773, 774 (5th Cir. 2020) (per curiam). There, a middle-school student suffered prolonged abuse at the hands of a school employee. The record showed that administrators "were aware of a close— likely inappropriately close—relationship between" the student and employee. *Id.* at 776. Indeed, the student's mother expressed her discomfort with the relationship on multiple occasions, but the school's "notice" of the close relationship was insufficient to show that the school actually knew "that anything of a sexual nature might be occurring." *Id.* The court held that while there were certainly "'red flags' that should have alerted the district of a substantial risk" of sexual abuse, "the law requires that the

district actually knew of the risk, not just that it should have known." *Id.* (citing *Rosa H.*, 106 F.3d at 652–53, 656); *see also Moreno v. McAllen Indep. Sch. Dist.*, No. 7:15-CV-162, 2016 WL 3198159, at *12-13 (S.D. Tex. June 9, 2016) (allegations of "bizarre behavior," including standing too close to a student, were not sufficient to provide actual notice of a substantial risk of sexual abuse or harassment).

That same logic applies with equal force here. However J.T. frames the knowledge dispute, the relevant question is not whether administrators could or even should have known about Wazed's misconduct; it is whether they *actually* knew. At best, J.T. cites conditions that would have caused an administrator to investigate further. But even that may be a stretch: Teachers turn off classroom lights and play videos for a range of appropriate reasons. The same holds true for using privacy folders. That Wazed employed these otherwise innocuous tools to further his horrific behavior does not mean their mere presence promotes to sexual abuse. *See, e.g.*, *Alvin Indep. Sch. Dist.*, 840 F. App'x at 776 (concluding that Title IX's actual knowledge requirement "cannot be satisfied by showing that the school district should have known there was a substantial risk of abuse"). It is, to the contrary, an unfortunate reality that abuse occurs in a range of otherwise harmless settings: behind closed doors, within private offices, or inside bathroom stalls. While this tragic case involves a dark classroom and privacy folders, a school cannot be held liable for its failure to notice every setting an abuser might use to prey on children. This is especially true when the school here had no reason to suspect Wazed posed a substantial risk of harm to M.L. or any other student. *See Roe v. Cypress-Fairbanks Indep. Sch. Dist.*, 53 F.4th 334, 341 (5th Cir. 2022) ("Specifically, the school must have actual knowledge that harassment has occurred, is occurring, or that there is a 'substantial risk that sexual abuse would occur.'" (quoting *Alvin Indep. Sch. Dist.*, 840 F. App'x at 775)). After all, he was widely beloved within the school community. Accordingly, a

reasonable jury could not find, based on these facts, that Uplift had actual knowledge that M.L. was at serious risk for abuse before receipt of the email.

2

That conclusion, of course, has nothing to do with Uplift's state of mind once it received an email about Wazed inappropriate behavior. As noted above, three years into Wazed's tenure, the elementary school director received a report from a concerned parent, recounting that Wazed kissed her daughter. At least in this regard, the parties both agree that this email was enough to impart Uplift with actual notice of sexual harassment. Accordingly, this section considers J.T.'s remaining Title IX claims regarding the email and Uplift's subsequent response.

Because the email satisfies Title IX's actual notice element, the next question becomes whether Uplift's response was deliberately indifferent. That standard is a difficult one for plaintiffs to meet, for it requires proving more than just negligence or unreasonableness. *Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 167 (5th Cir. 2011). A school district acts with deliberate indifference if its response to the known abuse was "clearly unreasonable in light of the known circumstances." *Roe*, 53 F.4th at 341 (quoting *Sanches*, 647 F.3d at 167).

J.T. argues that Uplift's conduct was deliberately indifferent. First, she asserts that Uplift responded to the email with a "woefully inadequate" investigation. Uplift interviewed only a few individuals—the mother who sent the email, four Kindergarten students, and Wazed. While the school's director believed the Kindergarteners' accounts, the school recommended that Wazed remain employed, albeit with additional workplace training. Although that recommendation was ultimately rejected, J.T. highlights that Uplift waited two weeks to report Wazed to Child Protective Services. Such a choice, she notes, contravened Texas law, which requires individuals to file

11

such reports within forty-eight hours after learning of abuse. *See* TEX. FAM. CODE §§ 261.101(a)–(b), 261.102, 261.103(a) & (c). Finally, and perhaps most concerning of all, J.T. notes that Uplift never notified parents, including herself, about Wazed's termination or the prior investigation.

A short time ago, this court reaffirmed that an inadequate investigation can be grounds for Title IX liability. In *Roe v. Cypress-Fairbanks Independent School District*, the court found that a reasonable jury could find that a school employee was deliberately indifferent where their method of investigation was inadequate. 53 F.4th at 341. That was because, after receiving complaints, the official never interviewed the plaintiff, never interviewed the perpetrator, waited weeks to speak to campus police, never obtained a campus police report, and took no further action once external law enforcement became involved. *Id.* at 345. Making matters worse, the school lacked any record or documentation of the purported investigation. *Id.* Based on those and other facts, the court held that a reasonable jury could conclude that the "district's response to a years-long abusive relationship" was enough "to show deliberate indifference." *Id.* at 345-46.

At the same time, this court has stressed that "botched investigations . . . due to the ineptitude of investigators, or responses that most reasonable persons could have improved upon do not equate to deliberate indifference." *I.F. v. Lewisville Indep. Sch. Dist.*, 915 F.3d 360, 369 (5th Cir. 2019). The holding in *Doe v. Dallas Independent School District*, 220 F.3d 380 (5th Cir. 2000), illustrates this principle. There, this court awarded summary judgment to the school district after a principal erroneously concluded that an alleged teacher-on-student assault never took place. In that case, a second-grade student reported that a teacher had fondled him. *Id.* at 385. Believing the student's claim was untrue, however, the principal never contacted CPS, monitored the accused teacher, or required that teacher to undergo additional training. *Id.* at 387-88. Later, the school discovered that

the accused had molested several boys for years and was criminally charged as a result. *Id.* at 381. Although the principal's initial assessment of the boy's complaint had "tragic consequences," the court reasoned that the principal's decision was not deliberately indifferent. *Id.* at 388. That was in large part because the principal responded in *some* way: she interviewed the student, his mother, and another teacher, and warned the accused that "he would be 'dealt with' if the accusations were founded." *Id.* Similarly, the school district in *I.F. v. Lewisville Independent School District* delayed investigating claims of rape and harassment by two months. 915 F.3d at 369, 374, 376. Despite such an oversight, the school district still interviewed several students, took the accuser's written statement, and offered the victim homebound academic support. *Id.* at 377. A panel of this court accordingly held that the school's actions were not "clearly unreasonable." *Id.*

These cases illustrate that Title IX mandates neither "flawless investigations [n]or perfect solutions." *Sanches*, 647 F.3d at 170. Deliberate indifference instead lies only where a school district completely "fail[s] to act" or "fail[s] to take additional reasonable measures after [a school] learned that its initial remedies were ineffective.'" *Menzia v. Austin Indep. Sch. Dist.*, 47 F.4th 354, 362-63 (5th Cir. 2022) (quoting *Porto v. Town of Tewksbury*, 488 F.3d 67, 74 (1st Cir. 2007)). So, rather than "second-guessing the . . . decisions made by school administrators," *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 648 (1999), this inquiry focuses on whether a defendant's acts or omissions were "tantamount" to the district "intentionally 'subject[ing] its students to harassment.'" *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 411 (5th Cir. 2015) (quoting *Davis*, 526 U.S. at 644).

Contrary to J.T.'s argument, the record does not show that Uplift responded in such a manner. To understand why, consider the available evidence: The school's director immediately removed Wazed from the

classroom after receiving the email alleging that he kissed a student. Administrators also investigated the allegations by interviewing five students. That investigation eventually resulted in Wazed's termination. True, the school did not immediately notify Child Protectives Services. But that alone cannot be a basis for Title IX liability. *See Dallas Indep. Sch. Dist.*, 220 F.3d at 388 (affirming summary judgment despite administration never contacting CPS); *see also Davis*, 526 U.S. at 648 (refusing to hold that "administrators must engage in particular disciplinary action" to avoid liability).

Nor was the school's failure to notify parents of the initial investigation functionally equivalent of "intentionally 'subject[ing] . . . students to harassment.'" *Fennell*, 804 F.3d at 411 (quoting *Davis*, 526 U.S. at 644). The omission was indeed a significant blunder, but "[a]ctions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference." *McCully v. City of N. Richland Hills*, 406 F.3d 375, 381 (5th Cir. 2005) (quoting *Alton v. Tex. A&M Univ.*, 168 F.3d 196, 201 (5th Cir. 1999)); *see also Porto*, 488 F.3d at 73 ("[A] claim that the school system could or should have done more is insufficient to establish deliberate indifference[.]"). In short, because Uplift took "some action . . . in an attempt to address" the alleged discrimination, a reasonable jury could not find that Uplift's response to the "known circumstances" was clearly unreasonable. *Fennell*, 804 F.3d at 410-11. Accordingly, summary judgment on this claim was appropriate.

Aside from the allegedly botched investigation, J.T. also argues that Uplift should have done more to "uncover and remedy the effects of Mr. Wazed's traumatic abuse." She asserts that Uplift should have taken "the kinds of actions that would address the full scope of the damage," like offering M.L. counseling services. For support, J.T. points to *Doe v. Russell County School Board*, 292 F. Supp. 3d 690 (W.D. Va. 2018). There, the

district court found that a reasonable jury could conclude that the school district failed to remedy effects of sexual abuse perpetrated by a school employee. *Id.* at 710. Although the student continued to experience ongoing harassment by peers after the abuser was removed, the school offered the student no counseling or other support. *Id.* at 701. The principal "undertook little to no investigation," and did not limit the abuser's access to the victim. *Id.* at 709.

The facts here are distinguishable. To reiterate, once Uplift first received the email, it placed Wazed on leave, investigated the report, and terminated Wazed's employment within a few days. Doing so ended all known harassment. Title IX required nothing more. Indeed, if a teacher's abuse of a student "ceased by the time a supervisory employee . . . learns of it, there is no liability in a private suit for that conduct based on some personal failure to take 'proper remedial action' thereafter." *Rosa H.*, 106 F.3d at 661. Here, Uplift's alleged failures to provide counseling and other services to M.L. after receiving the email did not subject her to continued sexual abuse and harassment or make her more vulnerable to it. Quite the opposite: Uplift immediately removed the abuser from the school. And when they discovered the extent of the sexual abuse almost a year later, Uplift offered counseling and academic support.[2]

J.T. counters that this case was especially egregious given the young ages of the victimized students. M.L., after all, was only six years old when she was repeatedly assaulted. To this end, J.T. argues, "common sense dictates" that professional treatment is necessary to overcome the physical, mental, and emotional consequences of sexual abuse. For added weight, she

---

[2] Indeed, during her interview, M.L. expressed her fondness of Wazed, stating that he was her "favorite teacher." At this time, Uplift had no indication that she needed counseling.

points to *Gebser v. Lago Vista Independent School District*, 524 U.S. at 277. She asserts that, in that case, the Court held that schools must do "whatever is deemed necessary" to overcome the effects of the discrimination. And, in cases such as these, meaningful action like mental health support is necessary to confront the prolonged damage of M.L.'s abuse.

But that argument overreads *Gebser*. The quoted language above was referencing Title IX in the administrative, not private, enforcement context: A recipient that is given notice of a Title IX violation may be required to "take such remedial action as the *Assistant Secretary* deems necessary to remedy the violation." 34 C.F.R. § 106.3(a) (emphasis added). Private actions, by contrast, impose no such requirement. To the contrary, the Supreme Court has never held "that the implied private right of action under Title IX allows recovery in damages for violation of . . . administrative requirements." *Gebser*, 524 U.S. at 292. And while M.L.'s age adds another layer of tragedy to this case, J.T. offers no authority for the idea that a violation of a Kindergartener's Title IX rights should be treated any differently than other school-aged children. That is for good reason: Who is to say one school-aged child's abuse is any more tragic than another's? At bottom, the district court correctly rejected J.T.'s claim that Uplift was deliberately indifferent because it did not remedy "the full scope of [future harm] caused by Wazed's abuse."

B

Along with J.T.'s Title IX claims, she also contends that Uplift is subject to "municipal liability" under 42 U.S.C. § 1983.[3] That statute creates

---

[3] Though J.T. raised several § 1983 issues before the district court, she only argues one basis for municipal liability before this panel: the district failed to adopt certain policies that would have prevented M.L.'s abuse. J.T. appears to have abandoned her remaining § 1983 theories on appeal. *Faciane v. Sun Life Assurance Co. of Can.*, 931 F.3d 412, 423 (5th

a remedy for individuals deprived of constitutional rights at the hands of state actors. In this case, J.T. argues that Wazed's sexual abuse violated M.L.'s Fourteenth Amendment right to "bodily integrity." *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 445 (5th Cir. 1994) (en banc). To hold Uplift liable for that violation, however, J.T. must prove it was caused by Uplift's policy or customs. Doing so requires the satisfaction of three elements: (1) identifying a policy-maker; (2) pointing to an official policy; and (3) showing "a violation of constitutional rights whose 'moving force' is the policy or custom." *Edgewood Indep. Sch. Dist.*, 964 F.3d at 364 (quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001)).

Only the second and third elements of that test are in dispute. To start, J.T. argues that certain Uplift policies were constitutionally deficient, mainly because several guardrails never existed. For example, she asserts that Uplift failed to adopt any policy prohibiting teachers from "dimming or turning off their classroom lights, being alone in secluded classrooms with students, [or] maintaining features in their classrooms that would keep sexual abuse hidden."

It is well-established that municipalities can be liable for their failure to adopt policies if the omission amounts to an intentional choice. *City of Canton v. Harris*, 489 U.S. 378, 387 (1989). Echoing the Title IX inquiry above, meeting that intentionality standard also requires that a plaintiff establish "deliberate indifference." *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011). In this context, deliberate indifference is present "when it is obvious that the likely consequences of not adopting a policy will be a deprivation of

_____

Cir. 2019) ("Our court routinely dismisses arguments as abandoned when parties fail to brief them.").

constitutional rights." *Id.* (quoting *Rhyne v. Henderson County*, 973 F.2d 386, 392 (5th Cir. 1992)). To see this principle in action, consider an illustration crafted by the United States Supreme Court: Imagine a municipality arming officers with firearms, knowing to a moral certainty that those officers will arrest fleeing felons. Failing to train the officers on the proper use of deadly force would be deliberately indifferent because the unconstitutional consequences of the municipality's omission is obvious. *City of Canton*, 489 U.S. at 390 n.10.

J.T. suggests that Uplift's conduct offers a suitable analog. In her telling, it was "obvious" that the "lack of commonsense policies" prohibiting dark rooms and secluded areas would jeopardize "the sexual safety of Uplift students." Yet, left unanswered in this argument is a pertinent question: Obvious to whom? The only evidence offered to support J.T.'s theory is an expert who opined that Wazed's dark classroom was a "red flag" that could suggest sexual abuse. Even if true, disregarding a "red flag" does not equate to choosing an action that "will cause violations of constitutional rights." *Porter*, 659 F.3d at 447 (quoting *Connick v. Thompson*, 563 U.S. 51, 62 (2011)). Beyond that, J.T. provides nothing else to show that the risk was plainly obvious. Nor does she offer evidence of past sexual abuse in dark classrooms that would have put Uplift on notice. On these grounds, Uplift "can hardly be said to have deliberately chosen" to violate constitutional rights through their omission of policies. *Id.* (quoting *Connick*, 563 U.S. at 62); *see Doe v. Snap, Inc.*, No. H-22590, 2022 WL 16635370, at *4–5 (S.D. Tex. Nov. 2, 2022) (holding that a district was not deliberately indifferent for failing to adopt policy prohibiting teachers from meeting students behind closed doors, because "[i]t is not 'so obvious' that a teacher who is alone with a student of the opposite sex will sexually assault that student" and there were no prior instances of a similar assault).

Though the municipal liability analysis could end here, J.T. also fails to meet the inquiry's remaining element—that the absence of a policy is the "moving force" that caused the constitutional violation. Doing so requires pointing to a municipal action "taken with the requisite degree of culpability" and "a direct causal link between the municipal action and the deprivation of federal rights." *Allen v. Hays*, 65 F.4th 736, 749 (5th Cir. 2023) (quoting *Valle v. City of Houston*, 613 F.3d 536, 542 (5th Cir. 2010)). Here, J.T. claims that the absence of policies prohibiting darkened classrooms and secluded spaces was the cause of M.L.'s traumatic abuse. For support, she points to Wazed's testimony, in which he stated that he would have followed such policies had they existed. But his speculation is insufficient: What makes those hypothetical rules any different from the actual laws and policies that Wazed chose to breach when he sexually abused several children? In any event, Wazed's intentional choice to harm students like M.L. was the actual cause of the constitutional violation—not Uplift's policies. *See Edgewood Indep. Sch. Dist.*, 964 F.3d at 365–66 ("When it comes to the 'moving force' behind the sexual abuse of Doe, we agree with the district court that [the abuser's] misconduct was the actual cause of the violation."); *see also Waller v. City of Fort Worth*, 515 F. Supp. 3d 577, 584 (N.D. Tex. 2021) (city's policies "[did] no more than set the stage for the events that followed" and while they "may be the 'but for' causes, [ ] they are not the moving force behind [the officer's] use of force"). Consequently, a jury could not reasonably hold Uplift liable for Wazed's horrific conduct.

## IV

What happened to M.L. was tragic and unacceptable. But the legal standards under Title IX and § 1983 create a steep hurdle for recovery. In this case, it is unfortunately a hurdle that J.T. is unable to clear. Accordingly, we AFFIRM the district court's summary judgment ruling in all respects.